STATE of Missouri, at the Relation of MISSOURI WATER COMPANY, a Missouri Corporation, Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, and Tyre W. Burton, E. L. McClintock, Charles L. Henson, M. J. McQueen and D. D. McDonald, as Members of Said Public Service Commission, Respondents.

No. 46019.

Supreme Court of Missouri, Division No. 1.

Dec. 9, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 13, 1958.

Emmet T. Carter, William K. Stanard, II, Gerald K. Presberg, St. Louis, for appellant. Edmund B. Naylon, George Foster, Jr., New York City, of counsel.

Glenn D. Evans, Gen. Counsel, Thomas J. Downey, Asst. Gen. Counsel, Frank J. Iuen, Jefferson City, for respondents.

John F. Thice, City Counselor, Independence, for City of Independence.

Benj. M. Powers, City Counselor, Frank O. Knight, Associate City Counselor, Kansas City, for Kansas City.

James V. Frank, City Counselor, Forrest G. Ferris, Jr., Associate City Counselor, St. Louis, Marvin E. Boisseau, Director of Law, University City, for City of St. Louis and League of Municipalities of St. Louis County, amicis curiae.

James M. Douglas, Richard D. Shewmaker, St. Louis, for Thompson, Mitchell, Thompson & Douglas, amici curiae.

HOLLINGSWORTH, Presiding Judge.

■ This is an appeal from a judgment of the Circuit Court of Cole County affirming a report and order of the Public Service Commission of Missouri fixing rate schedules for water furnished by the appellant, Missouri Water Company, to its customers at Independence, Missouri. The company sought schedules increasing its gross annual revenue in the estimated sum of $252,414.54. The report and order authorized schedules increasing such revenue to the estimated extent of $167,204.95. The amount in dispute is in excess of $7,500. Jurisdiction of the appeal, therefore, lies in this court. Article V, § 3, Constitution of Missouri, V.A.M.S.

On July 29, 1952, the Commission of its own motion ordered its staff to ascertain and determine the actual or estimated original cost of the company's property at Independence. During the progress of that investigation (Case No. 12,400 on the Commission's docket), the company, on May 11, 1954, filed the proposed schedules (Case No. 12,872 on the Commission's docket). The cases were consolidated and heard by the Commission in January, 1955. The City of Independence also appeared and introduced evidence at that hearing.

The company's principal office is at University City, Missouri. It operates in two areas: (a) Lexington, Missouri, and adjacent territory, and (b) Independence, Missouri, and adjacent territory. There is no physical integration of these properties, and they are kept separate for rate-making purposes. The case before this court involves only the Independence Division.

The territory served in and around Independence is about 40 square miles in size and lies south of the Missouri River and east of Kansas City, Missouri. The distribution system for that area consists of approximately 159 miles of cast-iron mains and 115 miles of small iron and steel mains. Included within these mains is a 16-inch cast-iron distribution main 3.6 miles in length leading from the east city limits of Kansas City to Independence. Storage facilities are composed of three elevated storage tanks, a standpipe and a 2,000,000 gallon surface reservoir, totaling 3,350,000 gallons capacity. In addition there are sev-

eral booster stations to increase pressure, and over 19,000 meters in service.

All water distributed by the company is purchased from the City of Kansas City. During the period between 1884 and 1925, most of the water sold in this territory was supplied by plants drawing water from the Missouri River. However, because of sewage contamination this source of supply was discontinued, and since 1925 all water distributed by the company has been purchased from Kansas City.

The original company furnishing water in Independence was organized in 1881 and mains, lines and hydrants were installed shortly thereafter. In 1893 the system was to some degree reconstructed and additions made to it. Other changes in plant occurred from time to time and the ownership of the properties likewise changed from time to time. The present owners acquired the property in 1947 and have operated it continuously since that time. Books of account for the years prior to 1914 are incomplete. Since that date records have been continuously kept and preserved. Its balance sheet indicates that on September 30, 1954, the company had recorded on its books an amount of $3,602,776.98 for utility plant at Independence, and for utility plant at Lexington, the recorded figure was about $413,-300.25. Its issued and outstanding capital stock consists of 1,315 shares of common stock with a total stated value of $565,353.-67, or a stated value per share of $429.92. The owner of the common stock, the St. Louis County Water Company, had also contributed an amount of $90,000 to the capital of the company. The earned surplus, on September 30, 1954, was $405,921.-94. The bonded indebtedness consists of first mortgage 3¼% bonds in the face amount of $950,000 and $600,000 face amount of 3½% first mortgage bonds. Interest payments for the year ending September 30, 1954, totaled $51,875. No dividends have been paid since December, 1942.

The last rate adjustment of the company was made during the year of 1951. It claims that since that time its earnings have declined and that it no longer earns a fair return on its investment. The decline in its rate of return is attributed to an increase in investment and operating expenses without a corresponding increase in revenue. In 1951, water purchased from Kansas City cost 10.42 cents per thousand gallons; on May 5, 1955, the cost had risen to about 14.81 cents, and by May 1, 1956 such water will cost about 15.21 cents. Its employees have been granted wage increases at different intervals since 1951, and the cost of electricity used in its operations has also risen.

Since 1952, the company's investment in additions and improvements has exceeded $1,000,000 and it expected to spend an additional $710,000 in 1955. Also, plans are being drawn for further improvements to be made in the reasonably foreseeable future which will cost about $1,500,000. The Commission's staff estimated the original cost of all of the company's property at Independence on December 31, 1952, at $2,756,812.34. From that amount the staff deducted the sum of $21,145.80, which it estimated to be the original cost of property on hand that was no longer used or useful in serving the company's customers. During the period from January 1, 1953, to September 30, 1954, net additions were made to the plant in the sum of $764,134.45. The books and records of the company showed that on September 30, 1954, its customers, "or persons in a relationship to the company similar to that of a customer", had advanced the sum of $341,283.06 for the purpose of assisting the company in various construction projects. This sum represented advances or deposits made by customers for construction or contribution in aid of construction of extensions, etc., which amount had been included in the original total cost estimate prepared by the Commission's staff.

On the basis of the aforesaid figures, the Commission concluded that original cost of the company's property used and useful in the public service as of September 30, 1954, less contributions in aid of construction,

should be the value assigned to the property upon which the reasonableness of the proposed rates should be predicated.

The figures, summarized for convenience, are tabulated in the Commission's report and order as follows:

| | |
|---|---:|
| Original cost of all property (12-31-52) | $ 2,756,812.34 |
| Less property not used and useful (12-31-52) | 21,145.80 |
| Original cost of used and useful property (12-31-52) | $ 2,735,666.54 |
| Plus net additions (1-1-53 to 9-30-54) | 764,134.45 |
| Estimated original cost (9-30-54) | $ 3,499,800.99 |
| Less contributions in aid of construction, etc. | 341,283.06 |
| Gross original cost of property included in rate base (9-30-54) | $ 3,158,517.93 |

The Commission then considered the evidence relating to depreciation of the various items of the company's property since their acquisition. It found that the sum of $482,089.36 was a reasonably accurate estimate of the depreciation reserve applicable to the property used and useful by the company in furnishing water at Independence on December 31, 1952, and that the depreciation accrued on the property between December 31, 1952, and September 30, 1954, amounted to the additional sum of $57,443.01; making a total depreciation of $539,532.37.

The Commission further found that an allowance of $82,000 was fair and reasonable for materials and supplies on hand: and that moneys accrued by the company from revenues collected in advance and from funds placed in reserve for the payment of income taxes were adequate for the company's cash working capital and that, in accordance with the policy of the Commission, where such facts are found to exist, no allowance would be made in the rate base for cash working capital.

The operating revenues of the company, for the year ending September 30, 1954, as determined by the Commission's staff, were $725,183.97. To this amount the Commission added the company's calculation that had all of its customers been connected to the system for a full year prior to September 30, 1954, its revenues for such year would have been increased by the sum of $21,906.74, thereby computing the company's annual income for the year ending on September 30, 1954, at the sum of $747,090.71.

The operating expense of the company, as found by the Commission, for the year ending September 30, 1954, was $611,762.96, before income taxes, to which was added an additional expense item of $16,131.19, being the amount of estimated operating expense "to give effect to the addition of new customers connected to the system during the year", thereby increasing the allowance for operating expenses for the year ending September 30, 1954, to $627,114.16. Federal and state income tax liability for the test year ending September 30, 1954, was computed at $24,300.88. The company's estimate of expenses of this case at $40,038 was accepted by the Commission and ordered amortized by annual charges of $13,346 to operating expenses over a three-year period.

The Commission concluded that, giving "due regard to the fact that [the company's] earnings must be sufficient to attract capital, to pay reasonable dividends on its capital stock, to service its debt, and to enable it to set aside a reasonable amount for contingencies and surplus", a rate of return of 6¼% "on a depreciated original cost rate base as of September 30, 1954", based on

operating results as adjusted for the year ending September 30, 1954, would be fair and ample.

The ultimate findings of the Commission above set forth are summarized in its report and order, as follows:

Rate Base

| | |
|---|---:|
| Original cost of property | $ 3,158,517.93 |
| Less depreciation reserve | 539,532.37 |
| | $ 2,618,985.56 |
| Plus allowance for materials and supplies | 82,000.00 |
| Net investment rate base | $ 2,700,985.56 |
| Rate of return at 6.25% | .0625 |
| Total net revenue requirement | $ 168,811.60 |
| Operating revenues | $ 747,090.71 |
| Less operating expenses except income taxes | 627,114.16 |
| Net operating revenue before income taxes | $ 119,976.55 |
| Less income taxes, state and federal | 24,300.88 |
| Net for return | $ 95,675.67 |
| Deficiency of net revenue requirement | $ 73,135.93 |
| Plus additional income tax | 80,723.02 |
| | $ 153,858.95 |
| Plus rate case expense | 13,346.00 |
| Amount of increase necessary to earn 6¼% return | $ 167,204.95 |

The company was ordered to adjust its books and records in accord with the findings above set forth.

On this appeal, the company contends the valuation placed upon its properties for rate-making purposes was erroneous in that it does not reflect the present fair value of its properties, does not allow it a fair return upon that value, does not include certain items of capital invested, over-estimates operating revenue, under-estimates operating expense; and, in excess of the Commission's powers, the company is retroactively ordered to change its depreciation reserve account as directed by the Commission. Some of these assignments require a somewhat detailed statement of certain of the evidence adduced by the company.

The testimony on behalf of the company's construction program was given by its president, W. V. Weir. It tended to show: Due to the high cost paid by the company for water furnished it by Kansas City and the unquestioned certainty that the supply thereof will be insufficient for future needs, the City of Independence has called upon the company to provide its own source of supply. This construction program called for an estimated expenditure of $710,000 in 1955, and eventually additional expenditures of approximately $1,500,000 will be required to complete the plant and transmission system.

The company's estimate of the fair value of its Independence property was made by L. R. Howson, a duly qualified expert. He testified, in substance: He had made an extended study of the present value of the property from the standpoint of cost of reproduction new less the accrued depreciation. His appraisal also made an allowance of 15% for general overheads which apply to all costs and an allowance of 5% for bringing the property to its present state of efficiency, commonly referred to as "Going Value". His estimate of reproduction cost less depreciation, as of December 31, 1952, was $5,185,000. Using the trending principle explained and used by the Commission's engineers, that value, as of September 30, 1954, would be increased to $5,583,725. Using the same principle and adding the additions made to the plant from January 1, 1953, through September 30, 1954, the reproduction cost of those additions would be $762,110. The total cost of reproduction less depreciation of the property used in public service, as of September 30, 1954, therefore, would be $6,324,057.

As to the effect of inflation in determination of a fair return on properties devoted to public service, Dr. Willian A. Paton, a certified public accountant, professor of accounting in the School of Business Administration and professor of economics in the Department of Economics, University of Michigan, testified: The major accounting problem of the day is that which has resulted from serious and sustained inflation. It has resulted to date in a decrease in the value of the dollar of roughly one-half. One of the major, general postulates underlying ordinary accounting procedures is the assumption of a stable, unvarying measuring unit. When this assumption is invalidated, as it has been in recent years, the result is to render raw accounting data, which has been accumulated over a considerable period, unusable as a basis for intelligent conclusions unless there is careful conversion and interpretation. Actual costs are not correctly determined when cost factors represented by different measuring units are added together as if they were the same thing.

He further testified: Conversion and interpretation of accounting is not in conflict with the Uniform System of Accounts for Water Companies prescribed by the Missouri Public Service Commission. The prescribed uniform system was based on the idea of a stable dollar. If the system as it stands represents good accounting through a period when the dollar is stable, it is to be implied that there must be a process of conversion or interpretation when a new monetary unit, unrelated to the old except in name, comes into use.

And further: The change in the value of the monetary unit resulting from the price inflation which has been experienced means that the costs of the various acquisitions of plant assets as they appear in the underlying records are stated in heterogeneous, unlike dollars in all cases in which these acquisitions have occurred over a considerable period in the past. Insofar as total actual cost of existing property is regarded as an important factor in the determination of the rate base, it is essential that such actual cost be correctly expressed. Any recognized index, such as the consumer price index, or the wholesale index compiled by the Bureau of Labor Statistics, or the Engineering News Record Construction Cost Index, could be used. .

J. K. Langum, a duly qualified expert in the field of economics, testified: During the last quarter of a century there have been three outstanding features in the American economy, namely: major inflation, phenomenal growth and the business cycle. Several causes have worked together to raise prices. The primary cause of inflation has been the tremendous increase in money-spending power in the nation resulting in large part from the World War II increase in the federal debt. In addition, we have had strong and continued demands for commodities and serv-

ices and therefore corresponding pressures for the use of this money-spending power. Successive rounds of wage increases since the war also have been an important part of the inflationary spiral. These factors are important, not only for their explanation of the past, but for their bearing on the future. Looking to the future, these monetary developments will not be reversed. As a practical matter the federal debt will not be reduced significantly because a large excess of tax receipts over expenditures is most improbable.

He further testified: Specifically with respect to the outlook for the price level over the next several years, it appears that the upheaval in the price structure after 1940 was not a usual cyclical development. It can be expected that prices will go up some in ordinary boom periods and go down somewhat in ordinary business downturns. Perhaps some small part of the increase in prices which we have had is cyclical. But the rise in prices since before World War II has been due basically to the war-created increase in federal debt and money-spending power. This development will not be, and is not being, reversed. The inflation in prices to which such increases gave rise will not be reversed. Even at the very bottom of any future business downturn, the price level will be far, far above the prewar level.

Mr. Langum's study of the current cost of capital to the company showed that during 1954 the yield in Moody's rated Baa public utility bonds, in which category were the company's bonds, ranged from a high of 3.72% to a low of 3.37%, averaging 3.-53%; that the current cost of the company's capital debt was in the range of 3.60% to 3.80%; that the cost of its equity capital (common stock) lies in a range of 10.30% to 10.80%; that using a structure of 62.5% debt and 37.5% common equity, which reasonably approximates the ratio of the company's capital structure over the last several years, the current over-all cost of capital to the company was about 6.25%.

He further testified: 6.25% does not represent a fair rate of return if applied to a rate base reflecting original cost rather than current dollar values. If it were not for the major inflation which our economy has experienced, cost of capital applied to an original cost rate base might provide a measure of fair rate of return. However, given the impact of inflation, the cost of capital provides a fair return only if applied to a fair value rate base which reflects current dollar values in substantial degree. Cost of capital is the amount expressed as a per cent that must be paid to attract new dollars of capital. If the rate of return on added investment is below the cost of capital, investors would not supply capital to the enterprise because their investment would earn less than if it were placed in alternative investment opportunities. Fair rate of return means a rate of return applied to the rate base that is fair to existing investment as well as to new investment in the enterprise. A cost of capital of 6.25% applied to $100 of preinflation investment will provide earnings of $6.25 a year in current dollars; but after the doubling of the price level in the inflation which we have experienced, $6.25 a year in current dollars is only about half of $6.25 a year received before inflation. Application of cost of capital to an original cost rate base results, therefore, in about a cutting in half of the real earnings on preinflation investment. A study of the earnings level of industrial enterprises reasonably comparable to public utility firms was also made. Certain enterprises similar to utilities have products which enjoy a stable demand and have common stocks which are immediate rivals for investor favor. Such firms are earning approximately 7% on net assets valued at current prices.

And further: The company would earn a fair return if its cost of capital of 6.25% is applied to a fair valuation of the property of not less than $5,000,000.

In its report and order, the Commission noted that the company had "presented

considerable evidence concerning the reproduction cost new less depreciation of the property and also as to its so-called 'fair-value' ". It then stated that following a study of that evidence and the other evidence in the case:

"[W]e are of the opinion and find that the best measure of the value of that property for rate-making purposes is its original cost less the depreciation accrued thereon. In arriving at this conclusion, we have given careful consideration to the statutes of this State, particularly Chapter 393 and Paragraph 4, Section 393.270, RSMo., that paragraph reading as follows:

" 'In determining the price to be charged for gas, electricity or water the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon *capital actually expended* and to the necessity of making reservations out of income for surplus and contingencies.'

The italicized language in this quotation to us means 'original cost', and we can think of no way to ascertain 'capital actually expended' except to find the cost of the utility plant at the time the properties were first devoted to public service.

"The wisdom and advantage of the use of original cost in determining the measure of value of utility property for rate-making purposes has been considered many times by this Commission. Original cost once established is easily maintained and can be re-established as of a later date with a maximum of certainty and a minimum of work and delay whereas other methods and procedures sometimes used or suggested for use in determining the value of such properties, e. g., reproduction cost new less depreciation, are so speculative, cumbersome and conducive to delay as to be completely impracticable.

"The objective of any rate case is to fix or approve rates which will permit a utility to earn an amount sufficient to provide it with a reasonable compensation for the service rendered and enable it to pay dividends sufficient to attract capital, to service its debt and to set aside a reasonable sum for surplus and contingencies. So long as these objectives are reasonably met, the rates for service are fair to the utility and in our opinion meet the test set by the General Assembly to be applied by the Commission in cases such as this.

"The Commission in determining the rates of a utility company which will permit it to earn amounts sufficient to achieve the objectives of a rate case has in past years used a formula as follows: *Original cost less depreciation plus materials and supplies times rate of return equals net earnings.* The product of the formula, i. e., net earnings, is controlled by the amounts determined to be proper for the rate base (original cost less depreciation), and the rate of return. Consequently, the Commission can insure that the objectives of a particular rate case are met by adjusting any one or both of the factors of the formula, and it is our opinion that the most satisfactory approach to attaining that objective is to adjust the second factor (rate of return) and hold the rate base to an amount representing actual and known amounts of investment.

"As previously indicated, the wisdom and propriety of using original cost less accrued depreciation as the value of a utility company's property has been considered by the Commission many times. The most recent case is Re Kansas City Power & Light Company, (No. 12,886) issued April 7, 1955. In that case, we reaffirmed our policy of using original cost as a rate base, as follows:

" 'Since the decision in the Hope Case, supra, (Federal Power Commission v. Hope Natural Gas Company [320 U.S. 591, 64 S.Ct. 281], 88 L. Ed. 333) it has been the opinion of

the Commission that we are free to rely on the original cost standard so long as the rate of return applied to that standard achieves a "just and reasonable" end result. We find nothing in our statute requiring the Commission to consider a reproduction cost new basis, nor do we find any opinion of our Supreme Court so interpreting our statute. The decisions in this state passing on the question at hand were all rendered prior to 1944 (date of Hope Gas Company decision) and a direct interpretation of the statutory requirements was not at issue and was not decided.

" 'In using original cost as a rate base, we are motivated primarily by practical considerations. The reproduction cost new theory lacks definiteness and stability. Each step in the process of estimating the cost of reproduction, or replacement, involves forming an opinion, or exercising judgment, as distinguished from merely ascertaining facts. A study may be out of date before completion. Rates should be as stable as possible under all circumstances and to secure this end it is necessary that the valuations upon which they rest be subject to the fewest possible fluctuations.

" 'It is quite true that if this Commission adopted a reproduction cost new less accrued depreciation rate base, it could apply a lower rate of return than can be applied to net original cost and arrive at the same end result. There is no reason or necessity for attempting to beguile or befuddle the public by applying seemingly low rates of return to inflated rate bases. The Commission desires to go on record at this time that it will approve a rate of return on a net original cost base which is deemed necessary to achieve a just and reasonable end result to both the public and the utility involved. By using such certain and well understood value of plant, the rate making process is simplified and uncertainty, guesswork, unnecessary expense and waste of time can be avoided for all parties concerned.' "

It is the contention of the company on this appeal that the Circuit Court erred in affirming the Commission's determination of the company's rate base because:

1. The Commission is required by law to determine the present fair value of the company's property and to allow the company to earn a fair return thereon;

2. The "Hope" case does not support the Commission's attempted rejection of the present fair value rate base. Such decision did not change the meaning and intent of the Public Service Commission Act as construed by this court;

3. The Commission erred in disregarding the undisputed evidence of reproduction cost new less depreciation and adopting "original cost" as its sole measure of present fair value; and

4. The Commission acted arbitrarily in ignoring present value and using original cost in view of current economic conditions.

■ Under the Constitution of Missouri, Article V, § 22, V.A.M.S., the minimum of the scope of our review of the report and order here challenged by the company is whether the report and order is authorized by law and, if so authorized, whether it is supported by competent and substantial evidence upon the whole record, State ex rel. St. Louis Public Service Co. v. Public Service Commission of Missouri, 365 Mo. 1032, 291 S.W.2d 95, 101, or, as stated in State ex rel. Chicago, Rock Island & Pacific Railroad Co. v. Public Service Commission of Missouri, Mo., —— S.W.2d ——, whether that "order is reasonable and lawful or, conversely, whether the order is arbitrary and without reasonable basis".

■ The reasonableness of rates charged by a public utility engaged in intra-

state activities, such as the appellant water company, must be determined with due regard to the due process and equal protection clauses of both the federal and state constitutions and the statutes of the state in which the utility operates. The decision in the Hope case, upon which the Commission predicated its report and order in the instant case, sprang from the continued insistence on the part of public utilities that reproduction costs be a dominant factor in determining the value of public utility properties for rate-making purposes. This tendency, it seems, had gained impetus from the case of Smyth v. Ames, decided in 1898, 169 U.S. 466, 546–547, 18 S.Ct. 418, 42 L.Ed. 819. In that case, the U. S. Supreme Court had under consideration the question of whether certain rates fixed by the State Board of Transportation of Nebraska were violative of the due process and equal protection of the law clauses of the Federal Constitution, U.S.Const. Amend. 14. It said, 169 U.S. loc.cit. 546–547, 18 S.Ct. loc.cit. 434: "[T]he basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway (railroad) under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

In 1942, the U. S. Supreme Court, in the case of Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, dealing with the due process clause of the U. S. Constitution in connection with the regulation of prices under the Federal Natural Gas Act, 15 U.S.C.A. § 717 et seq., repudiated Smyth v. Ames to the extent of saying: "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, *within the ambit of their statutory authority,* to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped." (Emphasis ours.)

In 1944, came the "Hope" case, Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, also dealing with the Federal Natural Gas Act. The opinion was written by Mr. Justice Douglas. Mr. Justice Roberts did not sit. Justices Reed, Frankfurter and Jackson dissented. In that case, Mr. Justice Douglas stated for the majority, 320 U.S. loc. cit. 602–603, 64 S.Ct. loc. cit. 287: "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact it is

challenged. It is the product of expert judgment which carries a presumption of validity. * * * The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that 'regulation does not insure that the business shall produce net revenues.' 315 U.S. at page 590, 62 S.Ct. at page 745, 86 L.Ed. 1037. *But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks.* That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." (Emphasis ours.)

Although numerous courts and commissions have treated that opinion as authority for total abandonment of a rate base predicated upon present value, it clearly is not, as we shall undertake to demonstrate.

In 1945, in the case of Colorado Interstate Gas Co. v. Federal Power Commission (commonly called the Canadian River Gas case), 324 U.S. 581, 601–602, 65 S.Ct. 829, 838, 89 L.Ed. 1206, Mr. Justice Douglas again speaking for the court in a case dealing with the Federal Natural Gas Act, said of the opinion he wrote in the Hope case: "It is obvious that when rates of a utility are fixed the value of its property is affected. For as we stated in the Hope Natural Gas Co. case, value is 'the end product of the process of rate-making not the starting point.' 320 U.S. at page 601, 64 S.Ct. at page 287. When a natural-gas company which owns producing properties or a gathering system is restricted in its

earnings by a rate order, the value of all of its property is affected. * * * Sec. 6(a), 15 U.S.C.A. § 717c(a), empowers the Commission to investigate and ascertain the 'actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation *and the fair value of such property.'* * * * *We must read § 1(b) in the context of the whole Act. It must be reconciled with the explicit provisions which describe the normal conventions of rate-making."* (Emphasis ours.)

Other courts have recently considered the Hope case. In the case of Illinois Bell Tel. Co. v. Illinois Commerce Commission, 1953, 414 Ill. 275, 111 N.E.2d 329, 335–336, the court said: "The Commission now urges this court to depart from its established holdings in public utility rate cases on the basis of the decision of the United States Supreme Court in the case of Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. The Hope case, however, is not a precedent for the formulas adopted by the Commission in this case. Moreover, the language of that case is consistent with the view expressed above."

And further, 111 N.E.2d loc. cit. 336: "It has further been pointed out by the Commission that one of the principal factors which enters into fixing valuation of a public utility is the rate of return itself. This statement at first blush has a deceptive quality of truth. Its best criticism is that it creates an inextricable circle, providing no beginning nor any basis for fixing a rate of return other than the nebulous formula 'that when all things are considered the rate should be just and reasonable and provide a reasonable return on the investment.' A further criticism would be that the adoption of such a rule would inevitably lead to the sin of over-invested capital, or to a situation susceptible to 'watered stock.' It was for this very reason that the sound,

common-sense, and business-judgment rule of a reasonable return on the fair value of the property was evolved in the history of rate making in this country."

A recent (September 17, 1957) and well considered opinion of the Supreme Court of Iowa, Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge, Iowa, 85 N.W.2d 28, 40, had this to say of the Hope case: "The foregoing indicates that while, if certain portions of the Hope case are considered independently of their context and the decision as a whole, it might tend to support the contention that the decision is authority to ignore fair value and 'the normal conventions of rate-making', the fact is, when the Hope case is fully considered together with the statutes with which it dealt, and viewed from the mature consideration of consequences observed and mentioned in the (so-called) Canadian River Gas Co. case, even the Hope case cannot be taken to be an authority that the finding of a rate base and 'conventions of rate-making' should be omitted in any public utility rate-regulating proceeding. The sum total of this Hope decision is thus seen to have been often misunderstood, distorted and exaggerated by those who used it as an authority for the proposition that formerly-established normal conventions of rate-making are now obsolete and that a rate base need not be determined in a public utility rate-making procedure. Indeed, this court does not perceive how any calculations of depreciation, legitimate financial expenses or indeed other calculations indispensable to regulating the rates of a public utility company without violating its rights under the due process clause can proceed without giving consideration to the somewhat baffling, but nevertheless unavoidable problems attendant upon ascertaining a rate base reflecting, to avoid confiscation, the fair present value of the property."

To the same effect is Railroad Commission v. Houston Natural Gas Corp., Tex. Sup.1956, 289 S.W.2d 559, wherein may be found an extended and well documented discussion of "value" for rate-making purposes. See also State ex rel. Olsen v. M. Public Service Commission, Mont.Sup.1957, 308 P.2d 633.

■ It is the duty and the province of this court to construe its own constitution and statutes in accord with their fair intendment and meaning. With that idea in mind, we now turn to our Public Service Commission Law, enacted in 1913. See Chapters 386 to 394, both inclusive, RSMo 1949, V.A.M.S. (All statutory references unless otherwise stated are to said revision.) Sections 393.130 to 393.280 are made specifically applicable to the regulation of gas, electric, water and heating companies by Section 393.110.

Section 393.130, Par. 1, requires that all charges made by any water company for water furnished shall be "just and reasonable and not more than allowed by law or by order or decision of the commission." Section 393.140 vests the Commission with supervision of such companies, including the quality of the water and methods of distribution; the power to order improvements and extensions and to prescribe uniform methods of keeping its accounts, records and books; power to determine and prescribe just and reasonable rates, require detailed annual reports of its operations, make inspections, conduct hearings and compel the production of exhibits. Section 393.150 vests the Commission with power, either of its own motion or that of the company or upon complaint, to conduct rate hearings and, *after full hearing,* to make such order as may be proper. Section 393.-230 provides:

"The commission shall have the power to ascertain the value of the property of every * * * water corporation in this state and every fact which in its judgment may or does have any bearing on such value. The commission shall have power to make revaluations from time to time and to ascertain all new construction, extensions and additions to the property of every * * * water corporation.

\* \* \* \* \* \*

"The commission may from time to time cause further hearings and investigations to be had for the purpose of making revaluations or ascertaining the value of any betterments, improvements, additions or extensions made by any \* \* \* water corporation subsequent to any prior hearing or investigation, and may examine into all matters which may change, modify or affect any finding of fact previously made, and may at such time make findings of fact supplementary to those theretofore made. \* \* \*"

Section 393.240 authorizes the Commission, after hearing, to require water companies to carry a proper and adequate depreciation account in accordance with such rules, regulations and forms of account as the Commission may prescribe.

In 1930, this court en banc, in State ex rel. City of St. Joseph v. Public Service Commission, 325 Mo. 209, 30 S.W.2d 8, 10, declared:

"There is no fixed rule for determining the fair value of property for rate-making purposes. *All facts which shed light on the question must be given due consideration.* We call attention to what some of the courts have said on that subject. In State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 546, 67 L.Ed. 981, 984, 985, 31 A.L.R. 807, it is said: 'It is impossible to ascertain what will amount to a fair return upon properties devoted to public service, without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is *wholly disregarded,* such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of to-day.'

"The same court in the later case of Standard Oil Company of New Jersey v. Southern Pacific Railroad, 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890, said: 'It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, *but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.'*" (Emphasis ours.)

To the same effect was the case of State ex rel. and to Use of City of St. Louis v. Public Service Commission, 326 Mo. 751, 34 S.W.2d 507. In that case, the rule in Smyth v. Ames, 169 U.S. 466, 547, 18 S.Ct. 418, 42 L.Ed. 819, was cited with approval, but, in addition thereto, the court said, 34 S.W.2d loc. cit. 510: "*All competent evidence must be received and given such weight as under the circumstances of the case is just and right.* Naturally this rule does not satisfy those who advocate any particular factor as always dominant in the determination of 'fair value,' or those who would arbitrarily adopt a rule of thumb in order to escape the arduous task of weighing the evidence, yet it is essentially the same rule that governs the receiving and weighing of evidence in any litigation. It follows that the stress or weight to be given the several factors that go to make up *fair present value* depends upon the circumstances disclosed by the evidence in the particular case." (Emphasis ours.)

In 1944, the Public Service Commission of Missouri decided the case of Public Service Commission v. Springfield Gas & Electric Co., 53 P.U.R.,N.S., 95, 105, and, in so doing, also construed our Public Service Commission Law as had this court in the cited cases. It said: "With this statute in mind (§ 393.270, Par. 4, supra) and in view of all the evidence we are of the opinion that for the present purposes a reasonable tentative rate base for the electric de-

partment may be said to be $4,000,000, and for the gas department $1,500,000. These figures for each of said departments are substantially in excess of the original cost of the properties as shown in Commission's Exhibit No. 1 and the reproduction cost depreciated hereinbefore discussed and take into account not only a fair value for the used and useful properties in each department but also a liberal allowance for Working Capital and Going Concern Value." In connection with that report and order, it is to be noted that the Commission was then fully aware of the decision in the Hope case. In the course of its findings, it said of that case, loc. cit. 106: "The United States Supreme Court in Federal Power Commission v. Hope Nat. Gas Co. (1944) 320 U.S. 591, 88 L.Ed. [333], 51 P.U.R., N.S., 193, 200, 201, 64 S.Ct. 281, states: 'From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & G. T. R. Co. v. Wellman (1892) 143 U.S. 339, 345, 346, 12 S.Ct. 400, 36 L.Ed. 176. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. The return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' "

■ A careful study of the foregoing statutes regulating the rates of gas, electric, water and heating companies leaves us convinced that our decisions above set forth and the decision of the Missouri Commission in the Springfield Gas case, supra, correctly construed the true intent and meaning of the Public Service Commission Law and that in fixing "just and reasonable" rates, as required by the Act, the Commission must stay within "the ambit of [its] statutory authority." Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed.

1037; New York Telephone Co. v. New York Public Service Commission, 1956, 309 N.Y. 569, 132 N.E.2d 847, 850, 12 P.U.R.3d 399.

■ This does not mean that such value must be based primarily upon either original cost or reproduction cost less depreciation. It was aptly said in Railroad Commission v. Houston Natural Gas Corp., Tex.Sup., 289 S.W.2d 559, 572: "[T]he original cost test deprives the equity ownership of any chance to fluctuate with changing economic conditions and makes it in fact very like a fixed indebtedness instead of an equity ownership. On the other hand, the test of reproduction cost new adjusted to actual age and condition during inflationary periods could be too large a burden on the public and during deflationary periods unfair to utility investors. So the burden of the cases is that the solution falls as a matter of judgment somewhere between these two brackets. This allows utility property to fluctuate in value but tends to even out the curve and flatten the extremes of economic cycles."

■ Thus it is that the courts do not and should not circumscribe regulatory agencies by any hard or fast formula. Each case must be determined upon its own facts and, oftentimes, varying factors that may be peculiarly relevant to a reasoned determination of the issue of "just and reasonable" rates under conditions then existing. It follows as a matter of course that neither the rate base nor the return to the company is to be fixed by "rule of thumb" or in the interest of expediency.

■ The statute (§ 393.270, Par. 4) says that the Commission may consider all facts which in its judgment "have any bearing upon a proper determination of the question [of the prices to be charged for water], with due regard, among other things, to a reasonable average return upon capital actually expended", etc. "Due regard" to one factor, "among other things", simply requires consideration of that factor. It is not preclusive of other relevant factors. Indeed,

the phrase "among other things" clearly denotes that "proper determination" of such charges is to be based upon *all* relevant factors. See New York Telephone Co. v. Public Service Commission, 1956, 309 N.Y. 569, 132 N.E.2d 847, 850.

■ Consequently, we must and do hold that in determining the price to be charged for (in this instance) water (§ 393.270, Par. 4) the fair "value of the property" of the water company which the Commission is empowered to ascertain under § 393.230, Par. 1, is a relevant factor for consideration in the establishment of just and reasonable rate schedules and must be considered in its proper relationship to all other facts that have a material bearing upon the establishment of "fair and just" rates as contemplated by our statutes and decisions. State ex rel. City of St. Joseph v. Public Service Commission, 325 Mo. 209, 30 S.W.2d 8, 10; State ex rel. and to Use of City of St. Louis v. Public Service Commission, 326 Mo. 751, 34 S.W.2d 507, 510; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 601–602, 65 S.Ct. 829, 89 L.Ed. 1206.

■ In the instant case, the Commission frankly states that in its determination of the rate of return to which the company was entitled it excluded from any consideration whatever the evidence relating to present "fair value"; and that in the interest of expediency, economy and the difficulty of determining such value with any degree of accuracy, it had adopted the formula of original cost less depreciation plus materials and supplies times rate of return equals net earnings.

In the Iowa case above cited (Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge, Iowa, 85 N.W.2d 28, 40–41) it was well said: "The Hope case was decided in the year 1943 upon facts arising in the year 1939, near the end of a twenty-year period of level or declining prices and construction costs. At that time, therefore, rates established upon original cost, prudent investment, reproduction cost or any other base, might have been the equivalent of rates based on present fair value as far as the 'end result' is concerned. Almost another sixteen years had passed by the time the trial court had entered its decision in the instant case and that twenty (sic) years saw an almost unbroken spiral of price inflation. Not endowed with psychic powers, the writer of the majority opinion in the Hope case could not have been expected to, nor had he any occasion to predict the erosion of the value of the dollar which was to come in the later period."

■ The decreased purchasing power of the American dollar, especially since the close of World War II, is a matter of common knowledge to owners and users of property and consumers of goods and services. Courts also know these facts and give such consideration to them as, in justice, they should. Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127; Conley v. Berberich, Mo.App., 300 S.W.2d 844, 850. So, too, must rate-making agencies. See Re Mountain States Telephone & Telegraph Co. (1956), Wyo. Pub. Serv. Com., 14 P.U.R.3rd 230, 233–234; Pennsylvania Public Utility Commission v. Pennsylvania Power & Light Co. (1956), 14 P.U.R.3rd 438, 462; Re Chesapeake & Potomac Telephone Co. of West Virginia (1956), W. Va. Pub. Serv. Com., 16 P.U.R. 3rd 299, 302, 306.

■ It is true that determination of "fair value" for rate-making purposes involves vexing problems of proof. Estimates of reproduction costs or other elements necessary to ascertainment of "fair value" frequently are given from a partisan standpoint and often are unsatisfactory. In this connection, however, it seems that once original cost is ascertained modern bookkeeping methods used in connection with recognized trending percentage tables and price indices can be used to establish both reproduction costs and depreciation with reasonable accuracy. The evidence in this case tends to so show, as do the findings in

many of the recent cases involving these questions. But however difficult may be the ascertainment of relevant and material factors in the establishment of just and reasonable rates, neither impulse nor expediency can be substituted for the requirement that such rates be "authorized by law" and "supported by competent and substantial evidence upon the whole record." Article V, § 22, Constitution of Missouri, V.A.M.S. For the reasons stated, we are forced to the conclusion that the order of the Commission is neither authorized by law nor supported by competent and substantial evidence upon the whole record.

Inasmuch as this case must be remanded to the Commission, we believe it unnecessary and, perhaps, unwise, to attempt to rule the other assignments of error herein asserted by the company.

The judgment is reversed with directions to the trial court to set aside the report and order herein reviewed and to remand the cause to the Public Service Commission for its further consideration.

All concur.