STATE of Missouri, ex rel, SPRINT SPECTRUM L.P., d/b/a Sprint PCS, Appellant,

State of Missouri ex rel. Southwestern Bell Wireless LLC, Appellant,

State of Missouri ex rel, Cellco Partnership, Appellant,

Cybertel Cellular Telephone Company d/b/a, Verizon Wireless, Appellant,

State of Missouri ex rel, AT & T Wireless Services, Inc., Appellant,

v.

The MISSOURI PUBLIC SERVICE COMMISSION, Respondent,

Southwestern Bell Telephone, Intervenor,

Office of Public Counsel, Respondent,

Small Telephone Company Group, Respondent,

Missouri Independent Telephone Company Group, Respondent.

Nos. WD 60928, WD 60929, WD 60942, WD 61070.

Missouri Court of Appeals, Western District.

April 29, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 2003.

Application for Transfer Denied Aug. 26, 2003.

Charles W. McKee, Overland Park, KS, for Sprint Spectrum, Paul S. Deford, Kansas City, Co–Counsel for Sprint Spectrum.

Dan K. Joyce, Jefferson City, MO, for Respondent.

Before EDWIN H. SMITH, P.J., LOWENSTEIN and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

This appeal arises from the Public Service Commission's approval of tariffs allowing certain rural telephone companies to charge specified rates for delivering calls from wireless companies. As Appellants, the wireless companies assert the Commission erroneously applied the law in granting the tariffs. We affirm in part and reverse in part.

## I.
## Factual and Procedural History
### A. Summary of Disputed Issue and Parties

This litigation involves a dispute concerning how small rural telephone companies ("rural carriers") in western Missouri[1] can be compensated for delivering calls that originate from wireless phones. Currently, the wireless companies direct their originated calls to a large interexchange carrier for transport to the destination telephone within the network of one of the rural local exchange companies. Although the wireless customers pay the wireless companies for originating such calls, and the wireless companies compensate the large interexchange carrier for transporting the traffic, this dispute arose because no one compensates the rural carriers for the use of their networks in completing these calls. The rural carriers initiated this proceeding by filing tariffs, with the Missouri Public Service Commission, to establish rates, terms, and conditions for delivering the wireless originated traffic to their local customers.

The parties relevant to this appeal are as follows:

*"Rural carriers"*—collectively refers to the local exchange companies that provide telephone services between points within an exchange; twenty-nine of these carriers[2] in the rural areas of

---

1. Missouri is roughly divided into two "major trading areas" for purposes of regulating telecommunications traffic. In this proceeding, the major trading area at issue largely encompasses the western half of the State. Telecommunications traffic originating and terminating within this area is referred to herein as "intraMTA" traffic.

2. The following rural carriers filed the subject tariffs: Citizens Telephone Co. of Higginsville, Missouri; Fidelity Telephone Co.; BPS Telephone Co.; Ellington Telephone Co.; King-

dom Telephone Co.; Oregon Farmers Mutual Telephone Co.; Alma Telephone Co.; Cass County Telephone Co.; MoKan Dial, Inc.; Peace Valley Telephone Co.; Farber Telephone Co.; Rockport Telephone Co.; Le Ru Telephone Co.; Goodman Telephone Co.; Steelville Telephone Exchange, Inc.; Miller Telephone Co.; Lathrop Telephone Co.; Ozark Telephone Co.; Green Hills Telephone Co.; KLM Telephone Co.; Holway Telephone Co; McDonald County Telephone Co.; Craw-Kan Telephone Coop., Inc.; IAMO Telephone Co.; Choctow Telephone Co.; Mark Twain

western Missouri filed the "Wireless Termination Service" tariffs that are the subject of this litigation.

*"Wireless companies"*—collectively refers to AT & T Wireless Services, Inc., Cingular, Sprint PCS, and Verizon Wireless, all of which provide cellular or wireless telecommunications services in western Missouri and filed motions to oppose the subject tariffs.

*Southwestern Bell Telephone Company ("SWBT")*—a large telecommunications company providing interexchange, local exchange, and exchange access services in the western Missouri trading area; SWBT opposed the subject tariffs as an intervenor in the Commission proceedings.

*Missouri Public Service Commission ("Commission")*—the administrative agency charged with regulating public utilities in Missouri; the Commission approved the subject tariffs over the objections of the wireless companies and SWBT.

**B. Historical Interrelationship of the Parties**

During the 1980's and early 1990's, wireless traffic was delivered to the rural carriers primarily through SWBT's wireless tariff. The tariff allowed wireless companies to send calls to SWBT's local exchanges but did not establish compensation for calls terminated in exchanges owned by the rural carriers. In a series of cases during the 1990's, the Commission found SWBT was liable to the rural carriers for their respective "terminating access" rates to complete the wireless calls. Thereafter, SWBT paid the rural carriers

for those terminations until the tariffs were revised in 1998.

In February 1998, the Commission permitted tariff revisions that eliminated SWBT's obligation to pay for wireless traffic delivered to the rural carriers. *In the Matter of SWBT's Tariff Filing to Revise its Wireless Carrier Interconnection Service Tariff, P.S.C. Mo. No. 40,* 7 Mo. P.S.C.3d 38 (December 23, 1997). However, the revisions also prohibited the wireless companies from sending calls through SWBT that terminated with the rural carriers, unless the wireless companies had an agreement to compensate the rural carriers. *Id.* Despite the fact that no such agreements were ever obtained, the wireless companies continued to send, and SWBT continued to transmit, wireless calls to the networks of the rural carriers without compensation. The rural carriers had no means to selectively block or refuse these wireless originated calls. The inability of the rural carriers to refuse these calls left the wireless companies with no incentive to make compensation arrangements when they could continue to terminate their calls at no cost.

Some of the rural carriers sought to obtain payment for the termination services by amending their intrastate-switched access tariffs[3] to apply to all traffic regardless of type or origin. The Commission rejected this proposal, concluding that calls originating and terminating in the same major trading area (intraMTA traffic) constitute "local traffic" not properly subject to switched access charges. *In the Matter of Alma Tel. Co.,* 8 Mo. P.S.C.3d 520 (January 27, 2000).[4] As

---

Rural Telephone Co.; Seneca Telephone Co.; New Florence Telephone Co.; and Granby Telephone Co.

**3.** "Access tariffs" are the rates that local exchange companies (such as the rural carriers) charge a long distance company for access to

their subscribers in completing a long distance call.

**4.** The Commission's decision (in what is commonly called the *Alma* case) was reversed and remanded by our court for failure to make

a result of that determination, the rural carriers filed the wireless termination tariffs at issue here in August 2000.

## C. Commission's Report and Order

In February 2001, the Commission issued a Report and Order approving the "Wireless Termination Service" tariffs requested by the rural carriers. The tariffs set rates, terms, and conditions applicable to wireless traffic originating and terminating within the western Missouri trading area, in the absence of negotiated agreements between the wireless companies and the rural carriers. The tariff rates differ for the various carriers, ranging from $.0506 to $.0744 per minutes of use, but uniformly include a $.02 surcharge for the use of the each rural carrier's local loop in completing the wireless calls. A provision in the tariffs also requires SWBT to assist the rural carriers in blocking wireless traffic if the wireless companies default on their payment obligations.

The Commission's decision was affirmed by the Circuit Court of Cole County in November 2001. The wireless companies appeal.

## II.

### Standard of Review

■ We review the determination of the Commission, not the circuit court. *State ex rel. City of St. Joseph v. Pub. Serv. Comm'n,* 713 S.W.2d 593, 595 (Mo. App. W.D.1986). The Commission's determination is presumed to be valid. *Friendship Vill. of S. County v. Pub. Serv. Comm'n,* 907 S.W.2d 339, 344 (Mo.App. W.D.1995). On appellate review, we must first determine whether the Commission's order is lawful. MO.CONST. art. V,

§ 18. In doing so, we exercise independent judgment and correct any erroneous interpretations of law. *Friendship,* 907 S.W.2d at 344. If the Commission's order is lawful, we must then determine if it is reasonable. *Id.* Reasonableness depends on whether the order is supported by competent and substantial evidence on the whole record, whether the decision was arbitrary, capricious, or unreasonable, or whether the Commission abused its discretion. *State ex rel. Mobile Home Estates, Inc. v. Pub. Serv. Comm'n of Mo.,* 921 S.W.2d 5, 9 (Mo.App. W.D.1996).

## III.

### Issues on Appeal

The parties to this appeal all agree that the rural carriers should be compensated for terminating wireless traffic. The disputed issue is whether the Wireless Termination Service tariffs comply with federal and state law. In this regard, the wireless companies contend the tariffs should not have been approved because they violate preemptive provisions of Federal Telecommunications Act of 1996 and Missouri laws that require just and reasonable rates and prohibit single-issue ratemaking.

### A. Federal Law

#### 1. Preemption Doctrine

Under the Federal Telecommunications Act of 1996 ("Act"), each "local exchange carrier" has the duty to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). This duty includes the responsibility to negotiate such compensation arrangements in good faith. *Id.* at § 251(c)(1). If the local

---

sufficient findings of fact. *AT & T v. Pub. Serv. Comm'n,* 62 S.W.3d 545 (Mo.App. W.D. 2001). The Commission recently issued an amended *Report and Order,* which is under

review by the circuit court. *In the Matter of Alma Tel.Co., Case No. TT–99–428* (Amended Report and Order, April 9, 2002).

exchange carrier negotiates but can not reach agreement, any party in the negotiation can request the state utility regulation commission to mediate the compensation arrangement based on the Act's pricing standards. *Id.* at §§ 252(a)(2), 252(b)(1)-(2).

■ In Points I and II of this appeal, the wireless companies contend the Act provides the exclusive procedure by which the rural carriers can seek compensation for terminating telephone traffic. Where federal statutes establish a comprehensive scheme to address a particular issue, a state has no authority to use different procedures other than those prescribed by federal law. *Amalgamated Ass'n of Street Elec. Ry. and Motor Coach Employees v. Lockridge*, 403 U.S. 274, 288–89, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Pursuant to this preemption doctrine, the wireless companies argue that a state's tariff proceedings cannot be used to supplant the negotiation requirements and pricing standards established in Sections 251 and 252 of the Act. *Verizon North, Inc. v. Strand*, 140 F.Supp.2d 803 (W.D.Mich.2000); *MCI Telecomms. Corp. v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157 (D.Or.1999). Because the Commission approved the Wireless Termination Service tariffs without following the Act's federally mandated procedures, the wireless companies seek reversal of the Report and Order, alleging an erroneous application of law.

We disagree that federal laws preempted the Commission's authority to approve tariffs in the instant case. The Commission determined that the Act's "reciprocal compensation arrangements" were inapplicable because no agreements were ever entered into by the wireless companies and rural carriers. The Act requires "local exchange carriers"—such as the rural carriers—to negotiate in good faith and establish compensation arrangements for the termination of traffic, but it does not impose the same obligation on wireless carriers. The term "local exchange carriers" is expressly defined in the Act to *exclude* providers of "commercial mobile service," such as the wireless companies. 47 U.S.C. § 153(26). The Act does not provide a procedure by which the wireless companies can be compelled to initiate or negotiate compensation arrangements with local exchange carriers. In the absence of a comprehensive scheme to address the wireless companies' conduct, the Commission did not use its tariff-approval authority to supplant federal law.

If the wireless companies had voluntarily agreed to negotiate rates for terminating traffic, then the rural carriers could have requested the Commission to mediate the compensation terms under Sections 252(a)(2) and 252(b)(1)-(2) of the Act. Without this voluntary compliance, the Act's procedural scheme for reciprocal compensation arrangements could not be invoked. It was the unavailability of these federal procedures that caused the rural carriers to pursue regulatory options under State law. Although the wireless companies have done nothing to bring themselves within the purview of the Act, they now seek to invalidate the subject tariffs by claiming federal law must be applied. We agree with the Commission's determination that federal law does not preemptively govern under the facts of this case.

Federal courts have recognized the right of states to enforce tariff provisions which are not inconsistent with the Act. *Mich. Bell Tel. Co. v. MCI*, 128 F.Supp.2d 1043, 1054 (E.D.Mich.2001). The tariffs approved by the Commission expressly state that they are subordinate to any negotiated agreements under the Act. Thus, the Commission's action does not prevent the negotiation of reciprocal compensation arrangements or otherwise conflict with the

Act's procedural requirements. This is a factor significantly distinguished from the cases cited by the wireless companies. State-approved tariffs were rejected in *Verizon North*, 140 F.Supp.2d at 809, because they displaced interconnection agreements under the Act, and in *MCI Telecomms. Corp.*, 41 F.Supp.2d at 1178, because they circumvented the Act. By stark contrast, the Wireless Termination Service tariffs are expressly subordinate to the Act. To supercede the tariffs, all the wireless companies have to do is initiate negotiations with the rural carriers and, thereby, invoke the Act's mandatory procedures for reciprocal compensation arrangements and pricing standards.

The wireless companies have failed to follow prior Commission orders to establish agreements with the rural carriers before sending wireless calls to their exchanges. The rural carriers have a constitutional right to a fair and reasonable return upon their investment. *State ex rel. Mo. Pub. Serv. Co. v. Fraas*, 627 S.W.2d 882, 886 (Mo.App. W.D.1981). The Commission cannot allow the wireless calls to continue terminating for free because this is potentially confiscatory. *Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591–92, 46 S.Ct. 408, 70 L.Ed. 747 (1926). The tariffs reasonably fill a void in the law where the wireless companies routinely circumvent payment to the rural carriers by calculated inaction. The tariffs provide a reasonable and lawful means to secure compensation for the rural carriers in the absence of negotiated agreements. Appellants' Points I and II are denied.

### 2. Call Blocking

■ In Point V, the wireless companies contend the Commission's decision unlawfully requires SWBT to assist the rural carriers in blocking calls from defaulting wireless companies. They argue the blocking provision is a violation of the Fed-

eral Telecommunication Act's requirement that SWBT "interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers[.]" 47 U.S.C. § 251(a)(1). Further, they suggest that such blocking could subject SWBT to third party liability claims for discontinuing service.

■ We disagree that the Act prohibits blocking the traffic of a carrier in default of applicable tariff provisions, such as failing to pay approved rates. In fact, the subject blocking provision is similar to a provision in SWBT's wireless services tariff. It is well established that telephone companies may discontinue service to a customer in default of a tariff, as long as proper notice is given. *See Allstates Transworld Vanlines, Inc. v. Southwestern Bell Tel. Co.*, 937 S.W.2d 314, 316–18 (Mo.App. E.D.1996). Significantly, the rural carriers have no ability to block wireless calls without the assistance of the interexchange company, SWBT.

The Commission noted that it was approving the blocking provision merely as a "request that SWBT enforce the provisions of its own tariff, because the wireless-originated traffic at issue is violative of SWBT's own tariff." The Commission also approved procedural safeguards—such as thirty days notice of default to the wireless companies and an opportunity to cure—that minimize SWBT's exposure to liability for discontinuing service. The tariffs allow SWBT to demand proof of notice and proof of actual default from the rural carriers before blocking can occur. The tariffs further provide that SWBT must be compensated for costs associated with the blocking services. SWBT is already entitled to indemnification for blocking under its own wireless service tariffs; thus, the Commission determined there was ample protection from liability.

The Commission did not act unlawfully in allowing the rural carriers to request assistance from the only entity, SWBT, capable of blocking wireless calls for non-payment. Point V is denied.

## B. State Law

### 1. *Just and Reasonable Rates*

■ Under Missouri law, tariff rates must be just and reasonable as to both the utility and the customer. § 392.200.1, RSMo 2000. The wireless companies challenge the reasonableness of the $.02 per minute "adder" or surcharge portion of the tariffs approved by the Commission. They contend the surcharge—which is intended to cover the maintenance and construction costs of the rural carriers local networks or "loops" used to terminate the wireless calls—is an arbitrary figure unrelated to the rural carriers' actual costs. In reviewing this claim on grounds of reasonableness, we can not substitute our judgment for that of the Commission if the rate determination is supported by substantial and competent evidence on the record as a whole. *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 706 S.W.2d 870, 874 (Mo.App. W.D.1985).

The tariffs proposed by the rural carriers were based on their access charges for intrastate toll calls with the addition of a $.02 surcharge for use of the local loop in terminating the wireless calls. The rural carriers' access rates had been approved by the Commission in prior proceedings and were, therefore, presumed lawful and reasonable. § 386.270, RSMo.2000 With the $.02 surcharge, the new Wireless Termination Service tariffs range from $.0506 to $.0744 per minutes of use, with an average rate of $.0605.

At the Commission hearing, the rural carriers examined their expert, Robert Schoonmaker, as follows regarding the rationale for the $.02 adder:

Q. In an earlier answer you indicated that in developing the rates in the tariffs under consideration that you added to the switched access rates an amount of two cents per minute to contribute to the cost of using the companies' local loop facilities. Can you explain your rationale for this?

A. Yes. In order to terminate calls from wireless carriers to the end user, the loop facilities of the company must be used. The wireless carriers benefit from the use of the loop in terminating this traffic. It therefore seems appropriate to have the terminating rate for wireless traffic contribute some amount to the overall cost of the loop facility.

Q. How was the two cents per minute contribution developed?

A. It was an arbitrary determination of a relatively low amount per minute so that the wireless carriers terminating traffic would make some contribution to the cost of using the loop facilities.

A witness for SWBT testified that SWBT's tariff includes a $.018 common carrier line charge which is considered to be a loop recovery charge. The witness acknowledged that such a charge might now be unacceptable under recent Federal Communications Commission rulings. While the testimony confirmed that this type of surcharge has been used in the past, it did not establish the current validity or justification for a $.02 adder.

We are unable to find any evidence in the record regarding the costs incurred by the rural carriers to construct and maintain their local loop facilities. There is no expert testimony to establish that the $.02 adder bears a calculable relationship to the wireless companies' usage of the loop facilities in terminating their calls. The only available evidence indicates the $.02 rate was an "arbitrary determination" based on

the need to have the wireless companies "make some contribution" to the unspecified overall costs of the network facilities.

Although it may be difficult to calculate an appropriate contribution rate of the use of the local loop, there must be evidence to justify the imposition of specific amount assessed. As the Missouri Supreme Court recognized:

> [H]owever difficult may be the ascertainment of relevant and material factors in the establishment of just and reasonable rates, neither impulse nor expediency can be substituted for the requirement that rates be "authorized by law" and "supported by competent and substantial evidence upon the whole record." Article V, § 22, Constitution of Missouri.

*State ex rel. Mo. Water Co. v. Pub. Serv. Comm'n,* 308 S.W.2d 704, 720 (Mo.1957). The admitted "arbitrary" nature of the surcharge compels us to conclude that it is neither just or reasonable. We reverse the Commission's approval of the $.02 adder because it is unsupported by competent and substantial evidence in the record.

## 2. Single Issue Ratemaking

■ Missouri's prohibition against single-issue ratemaking bars the Commission from allowing a public utility to change an existing rate without consideration of all relevant factors such as operating expenses, revenues, and rates of return. § 392.240.1;[5] *State ex rel. Mo. Water Co.,* 308 S.W.2d at 718–19; *State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 56–58 (Mo. banc 1979). The wireless companies contend the subject tariffs constitute single-issue ratemaking because they establish new rates for an existing service without the Commission undertaking a thorough examination of the overall rate structure.

■ The rationale behind the single-issue ratemaking prohibition is to prevent the Commission from allowing a utility to "raise rates to cover increased costs in one area without realizing there were counterbalancing savings in another area." *State ex rel. Midwest Gas Users' Assoc. v. Pub. Serv. Comm'n of Mo.,* 976 S.W.2d 470, 480 (Mo.App. W.D.1998). This rationale does not apply in the instant case because tariffs have never been established for the rural carriers' termination of the wireless-originated traffic. Both of the cases cited by the wireless companies, in support of their claim of single-issue ratemaking, deal with attempts to increase or change *existing* rates. *In the Matter of Southwestern*

---

**5.** Section 392.240.1. Whenever the commission shall be of the opinion, after a hearing had upon its own motion or upon a complaint, that the rates, charges, tolls or rentals demanded, exacted, charged or collected by any telecommunications company for the transmission of messages or communications, or for the rental or use of any telecommunications facilities or that the rules, regulations or practices of any telecommunications company affecting such rates, charges, rentals or service are unjust, unreasonable, unjustly discriminatory or unduly preferential or in any wise in violation of law, or that the maximum rates, charges or rentals chargeable by any such telecommunications company are insufficient to yield reasonable compensation for the service rendered, the commission shall with due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service and of the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, charges and rentals to be thereafter observed and in force as the maximum to be charged, demanded, exacted or collected for the performance or rendering of the service specified and shall fix the same by order to be served upon all telecommunications companies by which such rates, charges and rentals are thereafter to be observed, and thereafter no increase in any rate, charge or rental so fixed shall be made without the consent of the commission.

*Bell's Tariff Sheets Designed to Increase Local and Toll Operator Service Rates,* 5 Mo.PSC.3d 59 (June 21, 1996); *MCI Telecom Ins. Corp. v. Southwestern Bell Tel. Co.,* 6 Mo.P.S.C.3d 482 (1997). These cases are clearly distinguishable from the subject dispute because no rates existed at the time the rural carriers filed for approval of Wireless Termination Service tariffs.

The 1998 SWBT tariff revisions eliminated any responsibility for SWBT to pay for wireless traffic delivered to the rural carriers' exchanges. *In the Matter of SWBT's Tariff Filing,* 7 Mo. P.S.C.3d 38. The revisions obligated the wireless carriers to negotiate rates with the rural carriers for termination of the wireless calls. *Id.* Despite this obligation, the wireless companies continued to send calls without compensating the rural carriers, and the rural carriers had no capacity to block the wireless calls. The rural carriers subsequently attempted to apply their intrastate-switched access tariffs to these termination services. The Commission rejected this proposal, concluding that this was "local traffic" and constituted a new service that was not subject to existing rates. *In the Matter of Alma Tel. Co.,* 8 Mo. P.S.C.3d 520.

Based on this history, we find no error in the Commission's determination that the termination services at issue here cannot be characterized as an "existing service" for which "existing rates" are being charged. The single-issue ratemaking prohibition does not bar the approved tariffs because they do not change existing rates. Point IV is denied.

## IV. Conclusion

The Commission's decision is reversed with regard to the approval of the $.02 surcharge for the use of the rural carriers' local loops in completing wireless originated calls. In all other respects, the Commissioner's decision is affirmed.

All concur.