HANCOCK RURAL TELEPHONE CORPORATION ET AL. *v.*
PUBLIC SERVICE COMMISSION OF INDIANA ET AL.

[No. 20,077. Filed October 14, 1964. Rehearing dismissed
December 23, 1964. Transfer denied March 9, 1965:]

*While Judge Clements participated in the hearing of oral
argument and a conference of the judges, and concurred in the
result at the time of the conference, his untimely death occurred
before the adoption of this opinion.

*Arthur H. Gemmer,* and *Fauvre, Dongus, Ging. & Gemmer,* of Indianapolis, and *Busby, Davisson, Cooper & Fair,* of Anderson and *George & Harvey,* of New Castle, of counsel, for appellants.

*Edwin K. Steers,* Attorney General, *Marcus E. Woods,* Deputy Attorney General, and *Paul Hirsch,* Assistant Public Counselor, for appellee, Public Service Commission of Indiana.

*Robert W. Jeffrey,* of Indianapolis, for appellee, Indiana Bell Telephone Corporation.

*Roger Branigin* and *Stuart, Branigin, Ricks & Schilling,* of Lafayette, for appellee, General Telephone Company of Indiana.

*Goodrich & Warren,* of Indianapolis, for appellee, Knightstown Telephone Company.

HUNTER, C. J.—This is a statutory action seeking judicial review of orders of the Public Service Commission of Indiana, (hereinafter referred to as Commission) brought pursuant to the provisions of Acts of 1957, ch. 189, §1, et seq. (Burns' Ind. Stat. Ann., 1963 Poc. Supp., §54-443, et seq.) Appellants' assignment of errors alleges two specifications of error:

"1. The final order of the Public Service Commission of Indiana entered October 2, 1963, in PSCI Cause 29829 is contrary to law.

2. The order, issued subsequent to said final order, denominated 'Errata Order' of the Public Service Commission of Indiana entered *sua sponte* on December 13, 1963 in PSCI Cause No. 29829 is contrary to law."

The administrative proceedings before said Commission in said cause involved the purchase by one telephone company of the exchange of another, the improvement of service in both the purchaser's existing exchanges and the purchased exchange, the establishment of extended area service with adjacent exchanges and financing in the form of a loan from the Rural Electrification Administration (hereinafter referred to as REA) to accomplish these things. Appellant Hancock Rural Telephone Corporation (hereinafter referred to as Hancock) is the purchaser, appellant Markleville Telephone Company, Inc. (hereinafter referred to as Markleville) is the seller, and appellant Cadiz Rural Telephone Company (hereinafter referred to as Cadiz) is the owner of one of the adjacent exchanges with which extended area service is proposed. Named as appellees are The Public Service Commission, and Indiana Bell Telephone Company, Incorporated and Knightstown Telephone Company, the latter two were

joint petitioners below for extended area service 'to their respective exchanges. Also named as appellee is General Telephone Company of Indiana, Inc., named as a respondent in the administrative proceedings, however, said respondent during the course of the proceedings acquiesced in the proposed extended area service to its exchange.

The only answer brief filed in these proceedings is that of the appellee Commission filed by and through the Attorney General.

The proceedings before the Commission were initiated by a joint petition consisting of four separate paragraphs summarized as follows:

Paragraph I requested approval of the acquisition of appellant Markleville's telephone system by appellant Hancock, the issuance to the purchaser of a certificate of territorial authority to cover the new exchange area, and new rates;

Paragraph II asked approval for extended area service from the purchased Markleville Exchange to the Anderson Exchange of appellee Indiana Bell, to the Mechanicsburg Exchange of appellee General Telephone, to the Wilkinson Exchange of appellee Knightstown Telephone, and to the Cadiz Exchange of appellant Cadiz Telephone;

Paragraph III asked approval for appellant Hancock to make improvements in four of its existing exchanges; and

Paragraph IV asked approval of a loan of $295,000 from the Rural Electrification Administration to appellant Hancock to accomplish the acquisition, improvement and extended area service.

In the hearings before the Commission on said petition, *neither any telephone company nor any person appeared in opposition to any of the proposals, and the only witnesses and evidence offered, other than that by the joint petitioners,* was presented by the Public Counselor, and consisted of an accounting exhibit and

testimony by a Commission Staff Accountant and an engineering exhibit and testimony by a Commission Staff Engineer.

The evidence presented by joint petitioners demonstrably indicated, as to the acquisition, that both the seller's board of directors and shareholders had unanimously approved the contract of sale, and that purchaser's board had unanimously approved said contract, and that its officers had applied for the REA loan, which had been approved subject to Commission approval. Further, the evidence indisputably indicated, as to the proposed extended area service, that as between the respective exchanges it was approved and desired by the boards of the respective companies, and many responsible persons testified as to the community of interest between said exchanges and the need for such service. *As to both the extended area service and as to the improvement of existing exchanges, the evidence was detailed and unchallenged.*

However, as to these matters of acquisition, improvement and extended area service, the subject matter of the first three paragraphs of the joint petition, the *appellee Commission failed to make any finding in either of said two orders.*

It was only relative to the matter of *loan approval,* the subject of the fourth paragraph of the petition, *that appellee Commission made its finding, disapproving said loan, and upon this basis, denied said joint petition in its entirety.*

The evidence presented by appellant Hancock on this issue consisted of the testimony and accounting exhibit of the CPA witness, Clarence D'Aoust. His testimony and exhibits showed the method he utilized in determining the value of appellant Hancock's plant, including that to be acquired or constructed with loan funds.

This method consisted of taking original book costs depreciated, applying a dollar indices against these historic costs to update them in terms of current dollars, so as to adjust for the impact of inflation and to arrive at a current valuation of said property. He testified that from his study he was of the opinion that the long term debt of appellant Hancock did not exceed the fair value of its plant. During the course of his testimony, the Commission was also asked to take administrative notice of the fact of inflation, which it refused to do.

The record indicates that the evidence presented by the Commission's staff accountant was restricted by him to *original cost depreciated alone,* and in his testimony he (1) made certain subtractions from valuation of the plant for part of the value of the plant being acquired and also for all of the value of the plant to be constructed in the future; and (2) he also made certain additions to the long term debt by including an amount to cover "memberships issued" by appellant Hancock. He concluded that the long term debt exceeded the fair value of appellant Hancock's plant. In addition, he applied to appellant Hancock a "debt equity ratio", by which he purported to find appellant Hancock's financial structure unfavorable. As to all these differences between the staff accountant's approach, exhibits and conclusions, and that of witness D'Aoust, counsel for appellant Hancock made timely and repeated objection, and it is upon these issues thus raised, that appellants predicate error in the Commission orders.

Appellee Commission entered its final order in said proceedings, denying said joint petition, on October 2, 1963. On October 10, 1963, appellant Hancock filed with appellee Commission its Request for Record for Appeal. Thereafter, when it proved impossible to obtain a tran-

script from appellee Commission for filing with this court within the statutory appeal time, appellant Hancock, within its statutory time period, twice petitioned this court for an extension of time to file said transcripts and its assignment of errors, which requests were granted both times. Subsequent to said October 2nd final order, to wit: seventy-two (72) days thereafter, appellee Commission, on December 13, 1963, entered a second order in said administrative proceedings, which it titled an "Errata Order." This subsequent order was entered by appellee Commission, *sua sponte*, *without* any notice to appellants, or other parties to the proceeding and *without* any opportunity to be heard. Said "errata order", among other differences, contained no statement of reason for its issuance, included the testimony of a witness which had been omitted from the first order, included two exhibits which had been omitted from the first order, included *a new paragraph of matter outside the record and not in evidence, namely a letter, which had not been in the first order, and made a change in a finding* contained in the first order. Like the first order, the "errata order" denied the joint petition.

First, Specification No. 2 of the Assignment of Errors alleges that said subsequent "errate order" is contrary to law.

The statute which creates and limits the power of the Public Service Comission of Indiana to modify its orders provides as follows:

"The Commission may, at any time, *upon notice to the public utility and after opportunity to be heard,* as provided in sections fifty-seven to seventy-one (Sections 54-408 to 54-422), *rescind, alter or amend* any order fixing any rate or rates, or *any* other *order made by the Commission,* and certified copies of the same shall be served and take effect as herein provided for original orders."

(emphasis added) Acts 1913, ch. 76, §76, Burns' Ind. Stat. Ann., 1951 Repl., §54-427.

The record reveals that seventy-two (72) days after the final order of October 2, 1963, appellee Commission issued its subsequent order of December 13, 1963, in the same cause, and labeled it "errata order". Appellee Commission does not challenge the fact that this subsequent order was issued without "notice to the public utility" and without "opportunity to be heard". Therefore, the only question is whether the subsequent order attempts to "alter or amend" the prior order within the meaning of said statute.

Both the words "amend" and "alter" have already been construed by the Indiana Supreme Court.

"An *amendment* means to *'change or modify in any way* for the better.' Webster's Int. Dict. And see *Diamond v. Williamsburgh Ins. Co.* (1873), 4 Daly (N. Y.) 494, 500. *The word 'amend' is synonymous with 'correct,* reform, rectify'. *It means a correction of errors . . .*" (emphasis added) *McCleary v. Babcock* (1907), 169 Ind. 228, 233, 82 N. E. 453.

"*'Alter is to make otherwise'.* Webster's Int. Dict., p. 486" (emphasis added) *Adams v. City of Shelbyville* (1899), 154 Ind. 467, 486, 57 N. E. 114, 121.

It is difficult to see how the legislature could have selected broader words to cover any and every form of changing an order, than by using the words "alter or amend". Certainly, the changes of putting in omitted witnesses and exhibits, and changing findings comes within the clear meaning of said words. Nor does the title of "errate order" placed on said subsequent order by appellee Commission change the fact that the order seeks to "alter or amend" a prior order. The word "errata" is the plural of the word "erratum", which is de-

fined in The New Century Dictionary, p. 513, as meaning:

"An error in writing or printing."

The altering and amending of its prior order by appellee Commission in the subsequent order in the instant case was far more than merely correcting typographical errors. Furthermore, the additional fact that it was attempted seventy-two (72) days later and after the Commission was aware that its final order was under appeal to this court, clearly establishes it as an attempt to belatedly salvage an order already under appeal.

> "This was not a permissible *nunc pro tunc* order correcting clerical, ministerial errors or omissions. It was an attempt to substitute reasons where none had appeared . . . If administrative agencies, no matter how highly motivated their particular action may be, can, under the form of *nunc pro tunc* corrective order, presumably 'correct' the subject order to meet the objections specifically urged in a petition for judicial review, effective review would be denied. The vice of the 'and good cause appearing' technique is that it affords nothing the parties or court can take hold of to scrutinize and measure as the basis for the action. That is compounded if, on a challenge, review is then thwarted by substituting something else.
>
> . . . Courts and administrative agencies have, and must have, power to change their minds. But if it is the rule of law which controls, there must be some basis to indicate that it is reason and judgment that has brought about the change.
>
> . . . An order entered months after the judicial review has been set in motion and based on recitals not borne out by the available record does not change it. On the contrary, it dramatizes, again the danger, under our system of circumventing judicial review by claiming to find and then belatedly record that which was known in fact but imperfectly reflected in the official papers." *Dixie Carriers, Inc. v. United States* (1956), (U.S.D.C., Tex.), 143 F. Supp. 844, 852, 854, 855.

Accordingly, it is apparent that the "errata order" constituted an attempt by appellee Commission to 'alter or amend' a prior order, and that this Commission did without any attempt to comply with the provisions of Burns' §54-427.

"The state board of tax commissioners is *a body of special statutory powers and acts outside of its granted powers are absolutely void."* State Board Tax Comm. v. Belt R., etc. Co. (1929), 191 Ind. 282, 130 N. E. 641, and cases there cited. *"The same rule holds as to the Public Service Commission.* It is created and its duties defined by statute. Its powers and duties are conferred and limited by the statute, and *where power is given to do a certain thing in a certain manner, the manner prescribed is the measure of the power given.*

. . . *There has been no attempt on the part of the Commission* to comply with the provisions of (the statute). . . .

. . . *We hold the order in the instant case is ineffective and void, for failure to comply with the provisions of the statute, and therefore contrary to law."* (citing cases) (emphasis added) New York Central R. Co. v. Public Service Com. (1921), 191 Ind. 627, 635-7, 134 N. E. 282.

Therefore, we are constrained to hold that the order of December 13, 1963 is void.

Secondly, Specification No. 1 of the assignment of errors, alleges that the final order of October 2, 1963 is contrary to law.

Appellants' assertions of error as to this final order may for convenience of treatment be grouped in three categories.

First, appellants allege that the Commission applied a non-existent standard, i.e., ("debt equity ratio"), which had been deleted from the statute by the legislature in 1941, and which did not apply to not-for-prof-

it companies, such as appellant Hancock, while it was in the statute.

Secondly, appellants assert that the Commission wrongly applied the only existing statutory standard, i.e. (that the fair value of the plant not exceed the long term indebtedness), by *failing to include as part of plant valuation* (1) current value, arrived at by the application of dollar indices as opposed to historic book costs; (2) part of the value of the plant being acquired and all of the value of deferred plant to be constructed, as specifically required by the statute; and (3) by wrongly adding to long term debt an amount for "memberships issued" in the not-for-profit corporation, which amount was neither a "liability" nor a "security", as the term "long term debt" is specifically defined in the statute.

Thirdly, appellants urge that the Commission wrongly failed to make any finding whatsoever on the matters of acquisition, improvement of service, and extended area service, as to which the evidence was undisputed and remains unchallenged.

In order to appraise the validity of appellants' first two categories, it is necessary to examine the governing statutory standards.

Appellee Commission specifically applied and used as one of its grounds for refusing to approve the requested loan, the standard known as the "long term debt equity ratio":

". . . Petitioner's *long term debt* of 103.68% of its total capital structure is *extremely high and is unreasonable* . . . Therefore, the incurring of further debt would be contrary to the public interest . . . *the extremely high debt equity ratio* . . . illustrates the unreasonableness of same." (emphasis added)

(Commission Order, Finding No. 5)

This standard does not appear in any of the existing statutes governing appellee Commission. It was a former legislative standard originally included in Acts of 1913, ch. 76, §89, as amended *prior* to the 1941 amendment. (Burns' Ind Stat. Ann., 1951 Repl., footnote to §54-502, p. 751). As said standard originally appeared in said 1913 Acts, it provided as follows:

> "The *amount* of bonds, notes and other evidences of *indebtedness* which any public utility may issue *shall bear a reasonable proportion to the amount of stock and certificates of stock issued by such utility*, due consideration being given to the nature of the business in which the corporation is engaged, its credit . . . *the effect which such issue will have upon* . . . the efficient operation of the public utility *by reason of the relative amount of financial interest which the stockholders will have in the corporation* . . . Provided further however, that the *total amount* of preferred stock and indebtedness of any utility *shall not exceed* at any time by authorization of the commission an amount *in excess of seventy-five (75%) percent of the total capitalization of such public utility."* (emphasis added)

As outlined by the legislature in the 1913 Act, it appears that said standard was clearly a means to encourage corporations to issue stock as an alternative to incurring more long term debt, "to increase the relative amount of financial interest which the stockholders will have in the corporation." Thus, by its own hypothesis, said Act could have no application to not-for-profit companies, (such as appellant Hancock), which by their very nature cannot issue stock as an alternative to borrowing. Furthermore, the avowed purpose of such a ratio, as enunciated in case after case, was to keep a capital structure which would encourage private investment. Again, by hypothesis, such ratio could have no application to a company, such as appellant Han-

cock, which does all of its borrowing from REA. This conclusion is somewhat confirmed by the total absence of any Commission attempts to apply the ratio to any not-for-profit REA borrowing companies from 1913 through 1941.

In any event, the point becomes moot with the action of the legislature in 1941 by which it amended said 1913 act, totally deleting said ratio as a statutory standard, and replacing the entire section by the following single sentence. ·

"The amount of bonds, notes and other evidences of indebtedness which any public utility may issue *shall be reasonable in aggregate amount,* due consideration being given to the nature of the business in which the corporation is engaged, its credit, future prospects and earnings, and the effect which such issue may have upon the management and efficient operation of the public utility." (emphasis added), Acts 1913, ch. 76, §89, *as last amended* by Acts 1941, ch. 37, §1 (Burns' Ind. Stat. Ann., 1951 Repl., §54-502. See also last paragraph of footnote on bottom of page 751 and top of page 752 thereof).

Therefore, the sole statutory requirement for a debt equity ratio existed as a statutory standard only from the year 1913 to 1941, in which latter year it was completely removed by legislative action and has not since existed. As so replaced in 1941, said section now merely provides for a general standard "reasonable in aggregate amount" and we must look to Burns' Ind. Stat. Ann., 1951 Repl., §54-506 to find the specific standard of "reasonableness" specified by the legislature for approval of long term borrowing. This present statutory standard is the one which must govern the Commission and reads as follows:

"It shall be *unlawful* for the public service commission of Indiana to *approve the issue of any . . . notes maturing more than twelve (12) months*

after the date thereof . . . *when the total amount of such issue, together with the outstanding . . . notes* maturing more than twelve (12) months *. . . . is in excess of the fair value of the property of such public utility, including such acquisitions, construction, extensions, additions, and betterments to such property to be financed in whole or in part by such issue or the proceeds thereof,* as found by the public service commission of Indiana; Provided, however, that *any public utility corporation may issue as any* corporation organized for profit under the laws of the State of Indiana, . . . *its notes maturing more than twelve (12) months from the date thereof . . . in an amount not in excess of the value of the property of such public utility, including acquisitions, construction, extensions, additions and betterments to such property to be evidenced in whole or in part by such issues or the proceeds thereof, as found by the public service commission of Indiana . . ."* (emphasis added) Acts 1923, ch. 65, §1, Burns' Ind. Stat. Ann., 1951 Repl., §54-506.

The statute first states its standard negatively in terms of a prohibition to the Commission and then positively by giving a power or authority to a public utility. As so dually-stated, the components of the standard are the same, and may be paraphrased for ease of understanding as follows:

A public utility may incur long term indebtedness if the new indebtedness plus the old indebtedness does not exceed the *fair value* of its plant, *including the plant being acquired or extensions being made with the new indebtedness.*

It is apparent that this existing statutory standard is less strict than the former, deleted, debt equity ratio standard, and, accordingly, it seems that the appellee Commission was in error in attempting to apply said former, limited standard in the instant case.

Appellants also contend that not only did appellee Commission err in applying a non-existent standard, but that it further erred in the manner in which it improperly applied the existing statutory standard, Burns' §54-506, *supra*.

First, it is alleged that appellee Commission failed to properly determine the "fair value" of appellant Hancock's existing plant. The Indiana Supreme Court has already determined that the term "fair value" means "The *present fair value* of the used and useful property". *Pub. Ser. Comm. et al.* v. *City of Indianapolis* (1956), 235 Ind. 70, 131 N. E. 2d 308, 315. And the term has further been defined in 73 C. J. S., Public Utilities, §17, p. 1015 as follows:

". . . the *fair value* of the property of the utility useful and being used by it in the service of the public, *the criterion is the present value, as of the date to which the inquiry relates, expressed in terms of present money . . .*" (emphasis added)

Therefore, in the instant case, appellee Commission should have determined the *current* value of appellant Hancock's existing plant, and expressed said determination in terms of dollars of the year of hearing, i.e., 1963 dollars.

The record reveals that appellant Hancock's plant was originally constructed in 1953 and that certain additions thereto have been made from time to time during the subsequent years. Appellant Hancock presented evidence through its accounting witness of the value of that plant as shown on the books of the corporation in terms of historical original costs depreciated; however, said CPA then gave his expert opinion that these historical book costs could not be used in arriving at *current, fair value* without first making a necessary, accounting adjustment to offset the impact of inflation. The accountant testified:

". . . since World War II we have gone through a period of inflation and the dollar has decreased in purchasing power . . ."

Counsel for appellants on the record then asked the Commission . . .

". . . to take administrative notice of the fact of the decreased purchasing power of the American dollar, especially since the close of World War II, as being a matter of common knowledge."

The hearing examiner refused to take the requested administrative notice, and upon appeal of his ruling to the whole Commission, it likewise refused to take such notice. In so refusing to consider appellant's request, we believe the appellee Commission was in error.

The Supreme Court of Indiana has recognized that inflation is a fact of common knowledge of which courts will take judicial notice.

"We judically know that there has been an inflation in values since 1939. A utility corporation . . . take(s) the gain from an increase in values of its property . . ." *Pub. Ser. Comm. et al. v. City of Indianapolis, supra.*

Administrative bodies have the same authority to take administrative notice of facts of common knowledge as do courts. 2 Am. Jur., Administrative Law, §385, p. 191-2. Inflation therefor is such a fact of common knowledge that the Commission as an administrative agency must consider it as a factor in arriving at the current *fair value of utility property.*

"The decreased purchasing power of the American dollar, especially since the close of World War II, is a matter of common knowledge to owners and users of property and consumers of goods and services. Courts also note these facts and give such consideration to them as, in justice, they should. (citing cases). So, too, must rate-

making agencies." *State of Missouri ex rel Missouri Water Company v. Missouri Public Service Commission* (1957), 308 S. W. 2d 704, PUR 3rd 257 (Mo.).

Therefore, we are of the opinion that in reaching its conclusion the appellee Commission was in error in refusing to take administrative notice of and give ■ proper weight to the commonly known and legally accepted factor of inflation.

The effect of inflation, and recognition of its existence is particularly important in matters before the Public Service Commission as shown by the evidence and admission of the Commission staff accountant on re-cross examination:

"Q. Isn't it true that the Uniform System of Accounts and general accounting principles have, as a basic premise, the assumption that the dollar is a stable measuring unit?

"A. I would say it would be."

Thus, the Uniform System of Accounts governs accounting before said Commission, and, when its basic premise of a stable dollar is adversely affected by inflation, it becomes an accounting necessity to make an adjustment in accordance with the prevailing circumstances.

The record reveals that appellants' accounting witness made this adjustment to "update" the cost of appellant Hancock's plant, which was reflected on the books in terms of dollars of the particular year of construction, i.e., 1953 et seq. He did this by applying dollar indices published by the U. S. Department of Labor which reflected the relative purchasing power between dollars of prior years and those of 1963, the year of hearing. He testified that he selected as most applicable for measuring dollars in the telephone industry, the

Wholesale Price, Durable Goods Index. There is no testimony of any other accounting index, nor is there any testimony to show that this is not the index most applicable to the telephone industry. In fact, an item by item consideration of the categories making up that index by the staff engineer, established without dispute its applicability for this purpose.

The testimony and exhibits of the appellants' accounting witness, and of the Commission staff accountant, show the original book cost depreciated of appellant Hancock's plant to be $676,330. The updating of those book costs through application of the Wholesale Price, Durable Goods Index amounts in an increase of $44,149, resulting in a valuation figure of $720,479, as of September 30, 1962.

Appellants comprehensively amplified their evidence to the extent of establishing that the application of their price index and the updating of original book cost figures did not produce an unrealistic result, when their expert engineering witness, Richard L. Slater, testified as follows:

"Q (By Mr. Gemmer) Having made detailed surveys and being familiar with Hancock's plant and equipment, you have heard the accountant testify that in his opinion up-dated current value of the total plant expressed in 1963 dollars would be $726,493. Now, recognizing that is an accounting concept, does that figure arrived at, in your estimation constitute a reasonable or unreasonable figure for reproduction cost?"

". . . Yes, In my opinion, the figure stated by the accountant would be, with certain qualifications, a fair estimate of reproduction cost."

Appellee Commission in its final order seemingly entirely confused the purpose of applying the dollar indices to update original costs, erroneously stated the confirming testimony of the engineer, and refused to

recognize the validity of such application; the Commission, accordingly, refused to add said $44,149 figure in valuing appellant Hancock's plant.

The Commission's arbitrary assumptions and confusion of the application of price indices are shown by the following statements from their final order:

> "That in determining the fair value of Petitioner's plant, it is *necessary to consider the cost of replacement and reconstruction* of each and every item of telephone plant presently in service, and proposed. That many of the items comprising telephone plants are unique and peculiar to this utility service, and *the costs thereof cannot be derived from determining by application of price indices relating to certain raw materials* which make up a portion of the myriad of equipment involved. It is necessary in determining the fair value of Petitioner's telephone plant to designate the best estimate of the costs of each said item of equipment and materials . . . and many other factors which could affect construction costs. These can be determined by the testimony of persons thoroughly acquainted with the plant in service and proposed, and the variables above mentioned which affect the costs. *Application of theories such as the U. S. Department of Labor Wholesale Price Durable Goods Index do not constitute sufficient accurate calculation for determining such costs* and thus cannot be accepted even though many of the raw materials comprising this index are included in the items used in a telephone plant. *Application of these theories is not sufficient to show that they have a direct relation to actual reproduction costs* as current prices of a telephone plant." (emphasis added)

It should be obvious that price indices applied by an accountant to original book costs is not an attempt to determine reproduction costs. There appear to be two basic ways of arriving at current fair value: one is an engineering concept, the other is an accounting concept. The process by which an engineer "updates" the

physical plant in terms of current dollars is to hypothetically assume that he is re-building or "reproducing" the plant under present price conditions. This is known as the "reproduction cost" method. On the other hand, the process by which an accountant "updates" historic original cost as reflected on the books is to apply dollar indices so that all the book costs of different years and values are translated into terms of current dollars.

"Reproduction cost" is the manner by which an engineer arrives at current fair value. "Dollar indices" is the way that an accountant arrives at current fair value. They are comparable and parallel processes in two different fields to arrive at the same end result: i.e., to determine the current fair value of the plant.

Therefore, the Commission erroneously stated that the accountant used price indices "to arrive at reproduction costs". They were applied to original book costs by an accountant as an accounting necessity to render those book costs, as so updated, usable to show current fair value from an accounting standpoint.

The Commission also misstated the engineer's confirming testimony, i.e. " . . . the figure stated by the accountant would be . . . a fair estimate of reproduction cost", when it states in its order that said engineer "stated that he believed this would have *some correlation* to the actual reproduction costs of the entire plant." (Emphasis added)

Appellee Commission is authorized by another section of the 1913 Acts to consider "all bases of valuation which may be presented" (Acts 1913, ch. 76, §9, as amended, Burns' Ind. Stat. Ann., 1951 Repl., §54-203). The adoption by the Commission of a construction that the statutes preclude any basis, such as updating by use of dollar indices; and then, upon such construction, pro-

ceeding on a different basis, such as original cost depreciated *without* adjustment, to arrive at less than the "full fair value" would render the statutes ineffective. *Pub. Ser. Comm. et al.* v. *City of Indianapolis, supra.*

The record reflects that in the past the Commission has recognized the validity of the engineering "reproduction cost" method as a reliable engineering means of arriving at "current fair value". As early as 1926, the Public Service Commission of Indiana took administrative notice of inflation and utilized dollar indices to update book costs. The United States Supreme Court confirmed the propriety of this action by the Indiana Commission, holding:

> ". . . in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation. . . .

> ". . . this reasonableness of the use of average prices is apparent . . . The (Indiana) commission pointed out that enhancement of value 'may occur . . . by a decrease in the purchasing power or value of the dollar' ". . .

> "It is well established that values of utility properties fluctuate, and that owners . . . are entitled to the increase. . . . prices and values have so changed that . . . the cost of plant elements constructed prior to the great rise in prices due to the war do not constitute any real indication of their value at the present time. (citing cases) . . ."

> ". . . And we take judicial notice of the fact that . . . The trend has been upward . . . And it is clear that a level of prices . . . should be taken as the measure of value . . ." *McCardle v. Indianapolis Water Company* (1926), 272 U. S. 400, 408-412, 71 L. Ed. 316, 47 S. Ct. 144.

The necessity of utilizing price trends or dollar indices to arrive at a "current fair value" was emphatically enunciated again by the Supreme Court of the United States in 1935:

"It is true that any just valuation must take into account changes in the level of prices." (citing cases including the McCardle case)

". . . (The Commission's) error . . . did not consist in receiving and considering the evidence submitted of indices showing changes in commodity and other prices . . . *It would have been error for the Commission not to have considered it.*" (Citing cases) (emphasis added)

"For a period of twenty years or more of rising prices, commissions and courts, including this one, have regarded price variations as persuasive evidence that present fair value was more than cost." *West v. Chesapeake & Potomac Telephone Company of Baltimore*, 295 U. S. 662, 672, 79 L. Ed. 1640, and from dissent of Justice Stone, joined by Justices Brandeis and Cordoza, 295 U. S. p. 686; 692.

Later, in 1938, the Supreme Court of the United States upon appeal from another order of the Indiana Public Service Commission reversed for failure to use dollar indices to update original cost:

"The cause goes back to the District Court with the admonition that a 'general and persistent rise in prices should have been given effect in fixing a fair valuation." Affirmance of the Court of Appeals decree necessarily approves this statement and this statement requires an increased valuation of the Company's property . . ." *McCart v. Indianapolis Water Co.* (1938), 302 U. S. 419, from dissenting opinion of Justice Black at 423-24, 82 L. Ed. 336, 58 S. Ct. 324.

It appears that the Commission has also, in at least two recent cases, recognized the validity of the accounting "dollar indices" method as a reliable accounting means of arriving at "current fair value". In 1957, in the Indiana Telephone Corporation case, this Commission quoted the following accounting testimony with approval:

"Underlying ordinary accounting procedure is the assumption of a stable measuring unit and when this assumption is invalidated the raw data of accounting requires adjustment if actual cost is to be correctly determined. In other words, when the records include cost factors represented by varying measuring units it is not possible to determine cost . . . by adding the dissimilar units as if they were the same;"

". . . The impact of the change in the value of the dollar is especially important in the utility field."

". . . In the determination of the cost of plant consumed in utility operation, the varying dollars of investment reflected in successive generations of the plant installed should be converted by an appropriate index to current . . . dollars, so that this important cost may be accurately measured in the same kind of dollars . . ."

". . . For this purpose, any of the well known general indices are fairly satisfactory, and the use of an index based primarily on the costs incurred in the particular field will give satisfactory results, if the index is fairly broad—that is, includes a considerable number of underlying cost factors."

and the Indiana Commission then found:

"Inflation has caused a decline in the price level throughout the United States, causing the value of the dollar to decline . . ."

". . . the cost of plant consumed, measured in current dollars, and related to other factors as was done in the evidence presented herein tends to reflect a realistic picture . . ." *Re Indiana Telephone Corp.* (1957), 16 PUR 3rd 490.

Upon appeal to this Appellate Court, the Commission order was reversed because the Commission had attempted to apply the rates *retroactively*, and the Court did not disapprove the Commission's recognition of inflation and the application of dollar indices, and said testimony and recognition remained a part of the case upon remand. *Indiana Tel. Corp.* v. *Pub. Serv. Comm.* (1957), 131 Ind. App. 314, 171 N. E. 2d 111. See also

*Re Hoosier Water Co., Inc., Indiana* Public Service Commission, PSCI Cause No. 28297, 34 PUR 3rd 348.

"Fair value should take into considration original cost, and also reproduction or reconstruction costs, the facts of current value to reflect the greatly increased costs which have become imbedded in our economy. . . . Present reproduction costs, less depreciation has been the most generally accepted method of reflecting major changes in the price levels and of giving effect to current costs." (citing cases)

"It is not the only method, however, and *the use of original cost figures to arrive at fair value can be accomplished by the use of price indices. This method has been growing in use and acceptance both as evidence of present value and as forming a comparison with reproduction cost figures. Clarks Ferry Bridge Co. v. Penn. Pub. Ser. Comm.* (1934), 291 U. S. 227, 2 PUR (NS) 225, 28 L. Ed. 767, 54 S. Ct. 427; *McCart v. Indianapolis Water Co.* (1938), 302 U. S. 419, 21 PUR (NS) 465, 82 L. Ed. 336, 58 S. Ct. 324; *Los Angeles Gas & Elec. Corp. v. Calif. R. R. Com.* 289 U. S. 287, PUR 1933C, 229, 77 L. Ed. 1180, 53 S. Ct. 637; *State v. Tri-State Tel. & Tel. Co.* (1939), 204 Minn. 516, 28 PUR (NS) 158, 284 N. W. 294; *Re Montana Power Co.* (Mont. 1953) 1 PUR 3rd 167" (emphasis added). *Iowa-Illinois Gas & Elec. Co. v. City of Ft. Dodge* (1957), 248 Iowa 1201, 20 PUR 3rd 159, 85 N. W. 2d 28.

See also *Re New Jersey Power & Light Co.* (1952), 9 N. J. 498, 95 PUR (NS) 467, 89 A. 2d 26, which holds:

". . . courts and utility commissions throughout the country generally appear to recognize the doctrine that in determining valuations there should be taken into consideration the fact that a higher level of prices and materials has been brought about by conditions due to the devaluation of the dollar, the recent World War and the current emergency and inflationary economic situation . . ."

Therefore, upon the record in the instant case, appellee Commission was in error in relying upon original book cost depreciated to arrive at "current fair value", particularly so when the testimony and applied common knowledge established indisputably that inflation had rendered it unusable for that purpose without first making some accounting adjustment. We are of the opinion that the appellee Commission was further in error in failing to recognize the validity of applying dollar indices to *update* original book costs in arriving at "current fair value"; and, there appearing no evidence of record other than that utilizing the Wholesale Price Durable Goods Index, with the validity thereof confirmed by engineering testimony as producing a realistic result, the Commission possessed no discretion other than to find that the updated original costs depreciated constituted the *current fair value* of the plant.

In a closely analogous case, upon judicial review of an order of the Missouri Public Service Commission, the Missouri Supreme Court reversed a circuit court decision which had affirmed the Missouri Commission order. In so reversing, the Missouri Court held:

"The circuit court erred in affirming the Commission's determination . . .

. . . (3) The Commission erred in disregarding the undisputed evidence . . . and adopting original cost as its sole measure of present value; (4) The Commission acted arbitrarily in ignoring the present value and using original cost in view of current economic conditions.

. . . The decreased purchasing power of the American dollar, especially since the close of World War II, is a matter of common knowledge . . . Courts also know these facts and give such consideration to them, as, in justice they should. (citing cases). So, too, must rate-making agencies.

See *Re Mountain States Teleph. & Teleg. Co.* (Wyo. 1956), 14 PUR 3rd 230, 233, 234; *Pennsyl-*

*vania Pub. Util. Comm. v. Penn. Power & Light Co.* (Pa. 1956), 14 PUR 3rd 438, 462; *Re Chesapeake & P. Teleph. Co. of West Virginia* (W. Va. 1956). 16 PUR 3rd 299, 302, 306.

"It is true that determination of 'fair value' . . . involves vexing problems of proof . . . however, it seems that once original cost is ascertained, modern bookkeeping methods used in connection with recognized trending percentage tables and price indices can be used to establish . . . costs and depreciation with reasonable accuracy. The evidence in this case tends to so show, as to the findings in many of the recent cases involving these questions." *State of Missouri ex rel Missouri Water Co. v. Missouri Pub. Ser. Comm.* (1957), 308 S. W. 2d 704, 22 PUR 3rd 257 (Mo.).

In addition to the alleged error of refusing to determine the "current fair value" of appellant Hancock's existing plant, appellants also contend that appellee Commission has refused to add to that value, part of the value of the plant being acquired and all of the plant to be constructed in the future. The statute is clear and unambiguous on this point, no construction is necessary, no room for administrative discretion is provided, and it is difficult to understand why, in the face of timely objection, the Commission persisted in this improper exclusion. The statute, Burns' §54-506, defines "the fair value of the property" as:

"including any acquisitions, construction, extensions, additions, and betterments to such property to be financed in whole or in part by such issue or the proceeds thereof . . ."

The record is clear that the Markleville plant is such an "acquisition" to be "financed in whole" by "such issue or the proceeds thereof". The record is also clear that the contract purchase price of said plant (the rea-

sonableness of which contract and price is undisputed) is $22,000, and that this entire purchase price has quite properly been included in applicant's accounting exhibit as part of plant. It is equally clear that the Commission staff accountant's exhibit, without reasonable explanation deletes $10,097 of this plant being acquired, and that appellee Commission permitted this exhibit and omission in evidence over proper objection, and, likewise, deleted such amount from its finding of plant value. This unwarranted action of the Commission constituted error.

Furthermore, the record is clear that $28,050 in value of plant is to be "constructed" and "financed in whole" by such "issue" or the proceeds thereof. The accounting labeling of this item as "Deferred Construction" to distinguish it from the construction immediately taking place upon cutover, does not require it to be subtracted in determining the value of plants to be constructed under Burns' §54-506, *supra*. The Commission staff accountant's exhibit deletes the entire $28,050, and appellee Commission permitted this exhibit and omission in evidence over appropriate objection, and likewise deleted such amount from its finding of plant value. This omission constitutes further error on the part of the Commission.

As to the other valuation called for in the comparison standard of Burns' §54-506, *supra*, the statute is again clear and unambiguous and not open to construction or Commission discretion. The term "long term debt" is defined as:

"stock, bonds, notes maturing more than twelve (12) months from the date thereof, or other evidence of indebtedness of such public utility . . ."

It is evident upon the record that applicant Hancock is a not-for-profit corporation and that it does not issue

stock; and that its "membership certificates" for users do not construe any ownership share in the corporation, nor does the receipt by the corporation of "membership fees" for the issuance thereof, constitute any "liability", long or short term, of the corporation. Yet, over proper objection, the Commission staff accountant's exhibit, which added the entire $13,340 item representing membership fees to applicant Hancock's "long term debt" as though it were a "security" or a "liability", was permitted in evidence by the Commission, and mentioned in its order in a manner which makes it impossible to determine the extent to which it entered into its denial of approval of the loan. The order includes the following: " . . . after giving Petitioner the full benefit of the doubt on certain items such as issued and unissued memberships and equity certificates, which further illustrates the unreasonableness of same."

This Court experiences difficulty in determining just exactly what amounts and valuations the Commission used in arriving at its determination that "long term debt" exceeds the value of its telephone plant *in service*. The latter is contrary to the provisions of Burns' §54-506, *supra*, as is also the stated finding that "the excess of long term liabilities over net plant in service", and this for readily apparent reasons: (1) these Commission statements misstate the standard of Burns' §54-506, *supra*, which *does not say* "plant in service" but rather "plant, including acquisitions, construction, extensions, etc."; and (2) the *complete failure* of the Commission, before comparing the value of plant with the amount of long term debt, *to make any dollar finding whatsoever* as to either the "fair value of plant" or to the amount of "long term indebtedness". See *Kosciusko County, etc.* v. *Public Service Commission* (1948), 225 Ind. 666, 77 N. E. 2d 572.

Finally, appellants allege error in the failure of the Commission to make any finding whatever on the issues of acquisition, improvement of service, and extended area service which were the subject of the first three paragraphs of appellants' petition to the Commission, and on which the evidence is undisputed. Nothing further need be said on this point other than to quote the following applicable citation:

". . . The evidence was uncontradicted and unimpeached, and the Commission was not at liberty to disregard such evidence and make no special findings upon it . . . There was no finding made as to whether or not the agreed price . . . for the sale . . . was a fair and reasonable price. . . . The findings were so defective that the order based thereon was void. See *Public Service Comm. v. Indiana Telephone Corp.* (1957), 237 Ind. 352, 146 N. E. 2d 248, supra." *Gen. Tel. Co. etc. v. Pub. Serv. Comm. of Ind. et al.* (1958), 238 Ind. 646, 150 N. E. 2d 891, rehearing denied 238 Ind. 646, 154 N. E. 2d 372.

Therefore, we must conclude that the "altering and amending" order of December 13, 1963, and the earlier, final order of October 2, 1963, are contrary to law and void and should be set aside. We further conclude that the applicable statutes are clear and the evidence before the Commission in this case was undisputed, and that the error of the Commission consisted simply in not applying clear statutory standards to uncontradicted and unimpeached evidence. Within this area there is no room for administrative discretion, but in such case the role of the administrative agency is limited to applying clear standards to undisputed evidence to reach the inescapable conclusion dictated by such standards and such facts.

The order of the appellee Commission entered on the 2nd day of October 1963 and the "errata order" of De-

cember 3, 1963 are hereby reversed, vacated and set aside and this cause is remanded to the Commission with instructions to the Commission to proceed further in accordance with the views herein expressed and set forth with more particularity as follows:

It appears from the record that the evidence in this cause is exhausted on both sides and we, therefore, direct the appellee Commission to forthwith, and within the next ensuing thirty (30) days from the effective date hereof determine all the issues presented by appellants' joint petition of which the evidence as to Specifications I, II and III is by the record undisputed and unchallenged;[1] and further the Commission is directed to determine the "current fair value" of Hancock's existing plant, in accordance with the statutory and case law standards herein approved. In this connection we admonish the Commission, in arriving at its conclusions as to the "present fair value" of Hancock's existing plant; to

(1) Give effect to the general and persistent rise in prices;

(2) omit application of the now defunct "long term debt equity ratio" standard;

(3) to recognize the U. S. Department of Labor, Wholesale Price, Durable Goods Index;

(4) to increase the existing plant value by the contract purchase price of the plant being acquired with loan funds, without deduction of any part of said purchase price;

---

1. ". . . the trial court may not refuse to consider and weigh competent, uncontradicted evidence, such a refusal by the trial court is not weighing the evidence but ignoring it. *Egbert* v. *Egbert et al.* (1948), 226 Ind. 346, 80 N. E. 2d 104." *Smith* v. *Thomas et al.* (1955), 126 Ind. App. 59, 67, 130 N. E. 2d 85. "The trier of facts is not required to believe the testimony of every witness. *Soucie* v. *State* (1941), 218 Ind. 215, 31 N. E. 2d 1018. On the other hand the trial court may not refuse to consider and weigh competent, uncontradicted evidence. *Egbert* v. *Egbert et al.* (1948), 226 Ind. 346, 80 N. E. 2d 104." *Haynes* v. *Brown* (1949), 120 Ind. App. 184, 189; 88 N. E. 2d 795.

(5) to give credit without deduction of deferred construction for all improvements to be constructed with loan funds either at cutover or at deferred future date;

(6) to determine the amount of "long term debt" upon the basis of outstanding indebtedness and amount of proposed loan, and without inclusion of memberships issued or unissued by Hancock; and

(7) to make a fair and basic comparison as provided in Burns' §54-506, *supra*, of the "fair value" of the plant, arrived at upon the basis herein designated, and the long term indebtedness, without inclusion therein of issued or unissued memberships in Hancock.

Upon determination, by the appellee Commission, of the various essential issues and matters it should enter an order embodying the same not inconsistent with this opinion and instructions as above stated.

Faulconer, P. J., Carson, Cooper, Kelley, Mote, Pfaff, and Ryan, JJ.

### ON PETITION FOR REHEARING

HUNTER, J.—This cause is before us on the appellee Public Service Commission's petition for rehearing and appellants' motion to dismiss said petition for rehearing.

Rule 2-22 of the Supreme Court provides that petitions for rehearing shall be filed within twenty (20) days of this court's decision. Petitions for rehearing, also come within Supreme Court Rule 2-13 which provides that within the time allowed for filing petitions for rehearing, copies of the petition shall be served upon the *parties affected* or their attorneys of record. *Muniz, etc.* v. *United States et al.* (1958), 129 Ind. App. 433, 156 N. E. 2d 641; *Norling* v. *Bailey* (1951), 121 Ind. App. 457, 99 N. E. 2d 439.

The decision of the full court in this cause was filed October 14, 1964. On November 2, 1964 the appellee Commission filed its petition for rehearing with proof of service showing service *only* on the counsel for the appellants. On November 10, 1964, appellants filed a motion to dismiss said petition for rehearing, alleging that appellee Commission had failed to serve the other appellees of record within said twenty (20) day period, and attaching three affidavits in support of said allegation. In an analogous situation on a petition to transfer, the Supreme Court dismissed for failure to serve copies of petition to transfer upon parties appellee. *Sizemore et al.* v. *Public Service Com. of Ind. et al.* (1962), 242 Ind. 498, 180 N. E. 2d 232.

This court holds that the appellees Indiana Bell Telephone Company, Incorporated, Knightstown Telephone Company and General Telephone Company of ▮ Indiana, Inc. are *"parties affected"* within the meaning of Rule 2-13, *supra*, and that this rule applies to service of copies of petitions for rehearing within said twenty (20) day period.

The Supreme Court rules being binding upon all litigants and the court, *Guthrie* v. *Blakely et al.* (1955), 127 Ind. App. 119, 130 N. E. 2d 62, 131 N. E. ▮ 2d 357; *Muniz, etc.* v. *United States et al., supra,* and the record being thus conclusive as to appellee Commission's failure to comply with said court rules, this court now sustains appellants' motion to dismiss and holds that the appellee Commission's petition for rehearing should be dismissed. *Matlaw Corp.* v. *War Damage Corp.* (1953), 123 Ind. App. 593, 112 N. E. 2d 233; *Automobile Underwriters, Incorporated* v. *Smith* (1960), 131 Ind. App. 454, 167 N. E. 2d 882 (1961), 241 Ind. 302, 171 N. E. 2d 823; *Muniz, etc.* v. *United States et al., supra.*

The court in conclusion calls to the attention of the appellee Commission that the filing of a petition for rehearing which does not comply with the provisions of the Rules of the Supreme Court does not extend the time stated in our decision for compliance with our order of remand. Furthermore, twenty (20) days after the date of our decision the time for filing a petition to modify, extend or stay the compliance date also expired. In the case of *Pittsburgh, etc., Railway Company* v. *Mahoney, Administrator* (1897), 148 Ind. 196, 207, 46 N. E. 917, 47 N. E. 464 on a motion to modify mandate, the Supreme Court stated:

". . . Motion to modify a mandate entered by this court in a cause, is in the nature of a petition for rehearing, and may, at least during the time allowed for rehearing, be filed on behalf of a party who has not waived it." See also Flanagan, Wiltrout and Hamilton, *Indiana Trial and Apellate Practice*, §2838, P. 401.

In the instant case the appellee Commission failed to petition this court to extend or stay compliance with our order of remand.

Therefore, the appellee Commission's petition for rehearing is dismissed and the Commission is directed to forthwith take steps to comply with this court's order of remand of October 14, 1964.

For the court in banc.

NOTE.—Reported in 201 N. E. 2d 574. Rehearing denied 203 N. E. 2d 204.